(No. 32973.—

The People of the State of Illinois, Plaintiff in Error, *vs.* Sam Hryciuk, Defendant in Error.

*Opinion filed Nov. 18, 1954—Rehearing denied March 22, 1955.*

DAILY, HERSHEY, and KLINGBIEL, JJ., dissenting.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (JOHN T. GALLAGHER and ROBERT J. McDONNELL, of counsel,) for the People.

WILLIAM C. JEROME, of Chicago, (DONALD HAMILTON, of counsel,) for defendant in error.

Mr. JUSTICE MAXWELL delivered the opinion of the court:

In May, 1939, Sam Hryciuk, hereafter referred to as defendant, was tried and convicted by a jury in the criminal court of Cook County for the crime of rape and was sentenced to the penitentiary for the term of his life. Throughout the proceeding, defendant, who was then 19 years old, was represented by counsel of his choice. No immediate review of the judgment of conviction was sought and it was not until August, 1951, that defendant filed a petition, in the same court, seeking relief under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1951, chap. 38, pars. 826-832) on the ground that his constitutional rights had been violated in many respects. After amendment, answer, extensive hearings and argument, during which phases defendant was again represented by counsel of his own selection, the court sustained the petition and ordered that defendant be accorded a new trial. The People have brought the cause to this court for a review of that order, a right they have despite defendant's interpretations to the

contrary. See: *People* v. *Joyce,* 1 Ill. 2d 225; *People* v. *Wakat,* 415 Ill. 610.

Defendant's petition alleges some twenty-six points in support of his asserted denial of due process. In substance, they may be resolved into the following: (1) That defendant was arrested without process and held for six days during which period he was moved from police station to police station for purposes of procuring a confession; (2) that a confession admitted in evidence against him was false and untrue, was not voluntary and had been obtained by the police through physical violence and mental torture; (3) that the prosecution failed to prove the *corpus delicti;* (4) that defendant's conviction resulted from false testimony of the prosecuting witness; (5) that the prosecution wilfully and knowingly suppressed evidence favorable to defendant; (6) that he was denied a fair and impartial trial: (*a*) because of improper and prejudicial conduct on the part of the court and prosecutor; (*b*) because of improper rulings by the court; and, (*c*) because the jury was influenced by newspaper articles, prejudicial to defendant, which were published and read by the jurors while his trial was in progress.

After weighing the evidence submitted at the hearing on the petition, which included a stenographic transcript of the proceedings at the original trial, the court rendered an opinion in which it indicated the order for a new trial was predicated on the following grounds: (1) That the *corpus delicti* had not been proved; (2) that the prosecution had suppressed evidence favorable to defendant to obtain his conviction; (3) that the newspaper articles, which were published and came to the attention of the jurors during the course of trial, denied him a fair and impartial trial, and, (4) that defendant was further prejudiced when there was submitted to the jury a typewritten form of verdict upon which the word "murder" was interlined and the word "rape" substituted therefor.

Since we believe the petitioner has here shown a denial of a constitutional right in the proceeding which resulted in his conviction, that judgment must be set aside and a new trial ordered. Since the cause must be tried anew, we refrain from discussing the sufficiency of the evidence, the alleged suppression of evidence favorable to the defendant, and the alleged error in the form of the verdict, and confine this opinion to what we consider a substantial denial of the defendant's constitutional right to an impartial and unprejudiced jury.

The sordid facts of the alleged crime provoke intense indignation and create a situation readily susceptible to bias and prejudice against one accused of such a crime. The record shows that on the morning of June 1, 1938, at approximately 8:00 A.M. the prosecuting witness, a widow forty-four years of age, was walking through Humboldt Park in Chicago en route to her employment. While on one of the park walks, she was seized by a man, whose upper face she had an opportunity to see, and was dragged into some bushes where she was choked and brutally beaten until she lost consciousness. Sometime later she revived and, after wandering in a dazed condition into a nearby road, was found by a passing motorist. She was completely nude except for a girdle and a shred of her skirt and one of her stockings was knotted loosely about her neck. Police were called and the victim taken to a hospital where an examination by her family doctor disclosed, among other injuries, swelling and bleeding inside her vagina. At the trial the doctor expressed the opinion that she had been entered by some object, while the victim herself testified she did not know what occurred while she was unconscious. In the months that followed the victim's eleven-day stay in the hospital, she was called to the police station upon numerous occasions to view suspects but was unable to make an identification, and, as we interpret the record, it was some peculiarity of her attacker's eyes that

remained most vividly in her recollection. Returning for the moment to the date of the attack, police searching the area found articles of clothing belonging to the prosecutrix at the scene of the attack and one of her undergarments in a nearby public rest room.

Late on the night of March 14, 1939, approximately ten months after the attack described, police of the West North Avenue station were called to an address within three blocks of Humboldt Park where persons attracted by screams had seized defendant in the act of attempting to attack a young lady. Defendant was arrested and taken to the West North Avenue station and finger-printed. Because the station in question had no lockup defendant was removed to the Shakespeare Avenue station for the night. The following day he was taken to the sex bureau for questioning, following which he was returned to the West North Avenue station, questioned briefly, and again returned to the Shakespeare Avenue station for the night. On March 16, 1939, defendant was again returned to the North Avenue station where, while being questioned by the officer charged with investigating his arrest, defendant voluntarily confessed to the attack of June 1, 1938, in Humboldt Park, in terms leaving no doubt that he had committed the crime of rape. As part of his confession, defendant also stated that he had taken one of his victim's undergarments into a park toilet building and used it to cleanse himself. On the day following, March 17, the prosecutrix was brought to the station and identified defendant as the man who attacked her, and on March 18 defendant repeated his confession to the assistant State's Attorney who prosecuted the cause.

The petitioner's trial began on May 1 and was concluded on May 3. The jurors were not confined but were permitted to return to their homes each night. On the evening before the last day of the trial two of the Chicago daily newspapers published articles about the trial and

stated therein that the defendant had confessed to two murders for which the State planned to try him, and would seek a death penalty if defendant's confession withstood the legal attack made upon it in the rape case. One paper attributed its knowledge of this plan to the assistant State's Attorney who was conducting the prosecution. The same paper reported defendant had, when arrested, boasted of attacks on more than fifty women, that police described defendant as a vicious degenerate, and that defendant had been arrested while trying to attack a young lady. Both articles were headlined in heavy print, one reading, "State Will Ask Chair For Young Slaying Suspect," and the other, "Slaying Confession Read in Trial."

The morning following the appearance of the articles, defendant's counsel made a timely motion to the court to withdraw a juror and continue the cause. The court advised the jurors of the motion and upon inquiry learned that each of them had read one or both of the articles. The court then interrogated the jury, as a group, as to whether they could and would ignore what they had read and not allow themselves to be influenced by anything not heard in the court room. Receiving affirmative answers from at least some of the jurors the motion was denied.

The transcript shows that the jury was subsequently instructed to ignore the newspaper articles, to consider them false and unfair, and to consider only the evidence introduced in the case.

The problems created when a juror reads a newspaper account relative to a criminal trial he is trying, and the manner in which the courts have resolved those problems, are the subject of a recent annotation found in 31 A.L.R. 2d 417. It is there stated that the test in determining whether such an occurrence should occasion a mistrial, new trial or reversal, is whether, under the circumstances, a fair trial has been interfered with, the ultimate decision being dependent upon the facts in each case and resting in the

sound discretion of the court. The reported cases show not only a divergence of opinion as to what newspaper accounts are so prejudicial as to warrant a new trial but reflect also a definite cleavage on the issue of whether other circumstances may overcome the harm done when a juror reads such an account, and obviate the necessity for a new trial. In some of the cases cited in this annotation it is held that there are no circumstances which can be said to overcome the unconscious influence created in the mind of the juror or to restore the trial to a fair and impartial basis. In others, however, it has been held that the harm caused is overcome where the juror, upon inquiry by the court, states that such account will not influence his verdict and where the jury is instructed to disregard the newspaper article.

On this issue in the case before us, the People cite and rely upon the decisions of this court in *People* v. *Konkowski,* 378 Ill. 616, and *People* v. *Herbert,* 340 Ill. 320. In the *Konkowski case* the defendants made a motion, concurred in by the State's Attorney, that the jury be kept together during their trial for conspiracy to cheat and defraud. The motion was denied. The motion was supported by the unsworn statement of defendants' attorneys that there had been considerable publicity of a prejudicial nature about the case in the newspapers. We there held that this was not a sufficient showing of prejudice to show an abuse of the trial court's discretion in denying the motion. In the *Herbert case* defendant's counsel moved for a mistrial based upon counsel's assertion that the jurors had read newspaper articles referring to defendant as a "beer runner" and stating that there had been nineteen postponements of the case but defendant was at last forced to trial. The court denied the motion but gave the jury precautionary instructions to disregard the information contained in the articles. In holding that the trial court did not err in denying this motion this court said there was

nothing in the record, save counsel's assertion, to show that any of the jurors had read any of the articles, and it did not appear that defendant was prejudiced by their publication.

Our opinion in *People* v. *Murawski,* 394 Ill. 236, which neither party here saw fit to cite, is more analogous to the case at bar. On the second morning of defendant's trial for abortion her attorney presented a motion for a mistrial supported by his affidavit that the morning issue of the Rockford newspaper published an article which stated that, according to the records of the State's Attorney's office, defendant had been previously indicted on a charge of murder by abortion but was never brought to trial. The article also referred to two previous indictments for abortion. The motion was denied and no precautionary admonitions or instructions were given to the jury. In attempting to sustain this action of the trial court the People relied upon the *Herbert case,* and the cases which follow it, wherein we have held that the trial court does not abuse its discretion in denying these motions when there is nothing in the record to show that the defendant has been prejudiced. But we distinguished those cases from the case then under consideration because the record in the latter case did show facts from which the court could and did conclude that at least some of the jurors had read the prejudicial article, and no precautionary instructions were given to the jury. The trial court's denial of the motion was held to be an abuse of discretion and the cause was reversed and remanded for a new trial.

The vital question to be determined by the trial judge is whether the jurors, or any of them, have been influenced and prejudiced to such an extent that they would not, or could not, be fair and impartial jurors. A determination of this question involves the court's consideration of all the facts and circumstances and conjecturing upon the effect that the incompetent information has had upon

the minds of the jurors, a determination incapable of absolute accuracy or a very high degree of reliability. It has been held that jurors themselves are incapable of knowing the effect which prejudicial matters might have upon their unconscious minds. (*State* v. *Caine,* 134 Iowa, 147, 111 N.W. 443; *Commonwealth* v. *Jacques,* 1 Pa. Dist. 287.) It has been held that the mere possibility of prejudice is sufficient for the court to grant a new trial in a murder case (*Commonwealth* v. *Johnson,* (1887) 5 Pa. Co. 236,) and even in a lesser offense. (*State* v. *Barille,* 111 W. Va. 567.) Some of the cases permit a juror to say that he has not been influenced by reading prejudicial matter, (*People* v. *Mangano,* 354 Ill. 329,) while others say that the juror should not be permitted to say he has not been influenced because this is an inference which the court is to draw in each particular case. *United States* v. *Ogden,* 105 Fed. 371.

In any event the statement of a juror that reading a prejudicial newspaper article has not influenced him should not be considered conclusive. Basing the determination solely upon the statements of the jurors ignores and evades the real issue. The determination of that issue must, therefore, rest in the sound judicial discretion of the court to reach an inference, from all the facts and circumstances, that a fair trial has, or has not, been interfered with. Such inference is, however, a judicial discretion, the abuse of which will constitute reversible error. *People* v. *Murawski,* 394 Ill. 236.

Obviously the most controlling fact or circumstance to create an inference is the character and nature of the prejudicial statements. In the instant case the published articles stated that defendant had confessed to two murders, boasted that he had criminally attacked more than fifty women, and was described by the police as a "vicious degenerate." As we said in the *Murawski case,* it cannot plausibly be contended that such accusations are not prejudicial. It would not be unnatural for any law-abiding citi-

zen reading those articles to be incensed and incited with a desire to see that person severely punished. And it would be a violent assumption to say that twelve ordinary people, so incensed, could completely ignore their emotions and try the defendant without any conscious or unconscious prejudice. It would be more in accord with human experience to suspect that, try as they might, such emotions would linger in the consciousness of the most honest juror and tempt him to disregard the fundamental requirement of a fair trial and resolve any doubts he might have against the defendant. That fundamental requirement is constitutionally guaranteed to the guilty and innocent alike.

Where the question to be decided is of a subjective character, impossible of measured accuracy, each individual case must be determined upon its own peculiar facts and circumstances. It is for this reason that an arbitrary doctrine that the prejudicial effect of adverse publicity can in all cases be removed by the judge's admonitions or instructions has never been adopted by this court. All the jurors, on the evening before they were to render a verdict, read that the man they were trying had confessed two murders, had boasted of attacking more than fifty women, was referred to by the police as a vicious degenerate, and was arrested while trying to attack a young lady. It is alleged and not denied that this prejudicial news story was released to the newspapers by the assistant State's Attorney who was conducting the prosecution. He knew, or should have known, of its emotional impact upon those people who would read the story, including the jurors. We believe that the only reasonable inference that can be reached, under these circumstances, is that the defendant has been prejudiced and that the trial court abused its discretion in inferring that a fair trial had not been interfered with.

The court at the post-conviction hearing properly found a substantial denial of petitioner's constitutional rights in

the proceeding resulting in his conviction and was correct in setting that conviction aside and granting a new trial. That judgment is affirmed.               *Judgment affirmed.*

Mr. JUSTICE DAILY, dissenting:

While it is to be admitted that the reading of a newspaper article by a juror in the course of a criminal proceeding presents a question going to the fundamental fairness and constitutional integrity of a defendant's trial, I find myself in complete disagreement with the result of the majority opinion and the rule innovated therein. In my opinion its effect is to make a mistrial a matter of course whenever a juror reads an article derogatory to a defendant and thus, in contrast to the earlier procedures established by the decisions of this court, forecloses completely any inquiry or exercise of discretion by the trial court to ascertain if the reading of the article in fact made for an impartial trial. It is my feeling that such an inflexible rule is one whereby the speedy and efficient administration of justice will be unduly hampered and delayed, either innocently or intentionally, and that it is one which reflects a certain amount of unwarranted suspicion of persons chosen as jurors.

When the question has arisen in this jurisdiction, this court has always adhered to the rule that the reading of a prejudicial newspaper account warranted a mistrial only if it appeared that it actually had the effect of influencing the juror's decision and a trial court was vested with discretion in determining if such was the case. This appears to be the prevailing view in the majority of our Federal and State courts. (See: 31 A.L.R. 2d 430, sec. 17.) Thus, in *People* v. *Herbert,* 340 Ill. 320, described by some as the leading case in Illinois, it was held the court did not abuse its discretion in refusing to grant a mistrial when there was nothing in the record, save the allegations in defendant's motion, to show that any of the jurors had

read the newspaper article. The trial court, however, gave a cautionary instruction to the jurors that they were to ignore newspaper accounts and were to consider only evidence adduced in the case. In finding that the court had not abused its discretion, this court commented that the instruction was given "fully to protect" the defendant's rights and I think it reasonable to assume the language employed meant that the instruction had the effect of removing any prejudice created if the jurors had in fact read the accounts.

The same rule was applied in *People* v. *Mangano,* 354 Ill. 329, where the procedural situation presented exactly parallels that of this case. There a juror admitted reading a prejudicial newspaper article during the course of the trial but stated he had formed no opinion from such reading and, in view of his disavowal that he would be influenced, we held the trial court did not abuse its discretion in refusing to grant a mistrial.

*People* v. *Murawski,* 394 Ill. 236, which is commented upon at length in the majority opinion, applied the same rule but reached a different result because of the facts presented. There the chief issue was whether there was any proof that the jurors had in fact read the newspaper article. We concluded that they had but held that the court had abused its discretion in refusing a mistrial when it appeared that the jurors had not been admonished, either by instruction or otherwise, that they could not properly consider what the newspaper had said about the defendant in the case. I construe the language to mean that the effect of the prejudicial articles could have been overcome had proper cautionary measures been taken.

A kindred case is *People* v. *Dolgin,* 415 Ill. 434, where an unknown person attempted to bribe a juror during the course of a trial. We held that the attempt did not automatically require a mistrial to be declared and found, in view of the repeated assurances by the juror she had not

been prejudiced, her full and frank disclosures of the occurrence, the opportunity given to all counsel to examine her, the admonitions given by court and counsel and the assurance of the juror she would follow those admonitions, that the court did not abuse its discretion in denying a motion for a mistrial. Thus in the *Dolgin case* there was an overt act that would most likely be accredited to the defendant, or someone acting for him, yet the trial court was given discretion to determine if the prejudicial act would influence the trial and our decision admits to the concept that proper cautionary measures may overcome circumstances otherwise prejudicial.

In the present case the trial court did no more than to exercise its discretion within the limits fixed by the cases discussed. All the jurors were questioned and all stated that they would not be influenced by the newspaper accounts. Further, the court instructed the jury that it was to ignore the newspaper articles, to regard them as false and unfair and to consider only the evidence introduced in the case. It is my opinion that such cautionary steps should be given the same effect this court has always accorded them and that a trial court should not be deprived of the discretion of determining if the prejudicial accounts in fact influenced the trial.

The soundness of our former rule, which vested the court with discretion in the matter, is supported for reasons I have found to be best expressed in *Marrin* v. *United States,* 167 Fed. 951, (*certiorari* denied, 223 U.S. 719, 56 L. ed. 629,) where the court had this to say in dealing with the problem: "As already stated, the newspaper articles complained of were outrageous in character, and the indignation of counsel with regard to them was fully justified. But the action of the court must nevertheless be sustained in overruling the motion. While it was within the discretion of the trial judge to withdraw a juror and continue the case, he was certainly not required to do so

in the face of the declaration by the jurors who had read the articles that they would have no influence with them in arriving at a verdict. Even where a juror on his *voir dire,* in a homicide case, where the rules are held the strictest, admits to having formed an opinion as to the guilt or innocence of the accused from reading newspaper accounts of the transaction, and that opinion is so fixed that it would take evidence to remove it, yet, if the juror, at the same time, is able to say, and the court is so convinced, that if sworn as a juror he can discard this opinion and decide the case solely on the evidence as it is given by the witnesses, he is qualified to act, and a challenge for cause will not be sustained. (17 Am. & Eng. Cyc. Law, 2d ed., 1147; *Commonwealth* v. *Spahr,* 211 Pa. 542, 60 Atl. 1084.) This being the rule in selecting a jury before trial, much more is it to prevail afterwards, when the evidence is all in, and the case is about to go to the jury, and the complaint is that they have been exposed to improper newspaper influence, the effect of which upon them they explicitly deny. It is true that it may be a question how far a person is able to measure or dispel the bias to which he has been subjected, particularly in the case of articles so virulent and persistent as here. But, there being no other test, the matter has largely to be submitted to his own judgment; and, where attention has been called to it by an investigation such as was conducted here, even the ordinary juror, and much more the conscientious one, would be careful to try and exclude any suspicion of influence, with a reasonable chance of success. It was therefore a matter for the court in its discretion on the showing made to grant or refuse the motion to withdraw a juror. It was not bound to do so, so as to make a refusal of it an abuse of discretion of which we can lay hold."

As I interpret it, the majority opinion in the present case establishes for the first time a rule which will cause a mistrial to follow as a matter of course whenever some

prejudicial knowledge of the defendant comes to a juror during the course of trial and which denies the court any discretion to inquire if the juror was in fact influenced and the defendant in fact prejudiced. This is true despite the fact that the opinion says "The vital question to be determined * * * is whether the jurors, or any of them, have been influenced and prejudiced to the extent that they would not, or could not, be fair and impartial jurors." In meeting the vital question, however, the opinion all but forecloses any inquiry aimed at actually determining if the juror would, or would not, be impartial, by stating that the juror's denial of influence should not be considered conclusive and that it is for the court to decide whether the publication has left the juror's sub-conscious mind in such a state that bias and prejudice will result. As I see it, this is but another way of saying the court knows the juror's mind better than the juror himself. Such a test evades the very real issue presented, namely whether an admittedly prejudicial newspaper account can be said to have fatally infected the defendant's trial. If we say, as the majority opinion in effect does, that a juror is incapable of deciding whether he can be fair or impartial, then, as demonstrated by the result reached in this case, a mistrial must follow as a matter of course whether or not the juror was actually influenced. Such an inflexible rule destroys the discretion heretofore vested in the trial court.

Further, in this day of complete news coverage through so many different media, I can foresee future harm from the rule that is being established. Simple consistency would dictate that the same inflexible rule would have to be applied where a prospective juror states on his *voir dire* that he has read or heard news accounts prejudicial to the defendant, for, even if he states that he has formed no opinion and that he has no prejudice, the trial court shall be committed to our rule that the juror is incapable of conclusively determining those matters. Few persons would

ever qualify as jurors and the result would be an intolerable burden on the administration of criminal justice.

Apart from my view that we should adhere to our former rule and hold that the trial court did not, because of the cautionary measures taken, abuse its discretion in refusing to grant a mistrial, I think there is yet another reason why the judgment of conviction should not be disturbed in this case. In 31 A.L.R. 2d 434, sec. 21, where numerous cases are cited and discussed, it is stated that "Where the evidence in support of the jury's verdict is such that a jury could not have honestly or intelligently returned any other verdict than the one it did return, the courts have held that there should not be a new trial, mistrial, or reversal on the ground that the jurors had read newspaper accounts of the proceedings." In my opinion the record presented here makes this principle singularly applicable. Adequate and convincing proof shows defendant committed the heinous crime of forcible rape upon a physically afflicted widow and mother with a viciousness and unnaturalness that finds few parallels in the annals of this court. Also, the life penalty, while severe, is within the limits prescribed by law and is not without precedent in such cases. Under the circumstances the jurors returned the only verdict that could be honestly and intelligently returned.

Considering all the factors, it is my conclusion that the verdict of the jury was arrived at fairly and impartially, that the trial court fully protected defendant's trial rights, and that he is not entitled to a new trial.

Mr. JUSTICE HERSHEY, dissenting:

I dissent from the majority opinion, but for different reasons than those assigned in the other dissenting opinion.

The majority opinion, finding that the jurors could not have considered the evidence fairly after reading the newspaper accounts referred to, concludes that the trial court

abused its discretion in refusing to declare a mistrial or grant the petitioner a new trial. It is stated that the petitioner was thereby deprived of the fundamental requirement of a fair trial, which is constitutionally guaranteed.

The other dissenting opinion states that the trial court did not abuse its discretion, since proper cautionary measures were taken by the trial judge. In addition, it is said that the jurors returned the only verdict that could honestly and intelligently be returned under the circumstances.

As authority for the conclusions thus arrived at, cases are cited and considered wherein a direct appeal was taken from the conviction. The fact that a reviewing court deems the trial court to have abused its discretion will, of course, be reason for a reversal upon a writ of error, appeal, or other direct review of the conviction. But it does not follow that such reversal is upon a *constitutional,* as distinguished from a nonconstitutional, ground. Moreover, it does not follow that the abuse complained of deprives the defendant of a substantial constitutional right, thus entitling him to relief in a collateral proceeding such as this proceeding under the Post-Conviction Hearing Act. Presumably the "fundamental requirement of a fair trial" referred to in the majority opinion is based upon the due process clause of the fourteenth amendment of the Federal constitution. See *Shepherd* v. *Florida,* where the Supreme Court of the United States said that newspapers, in the enjoyment of their constitutional rights, may not deprive accused persons of their right to a fair trial.

It is extremely difficult to determine the scope of the due process clause of the fourteenth amendment as it pertains to State criminal procedure. However, *Palko* v. *Connecticut,* 302 U.S. 319, although dealing with a different subject than the reading of newspaper articles by jurors, has been regarded as a touchstone where the due process clause is invoked to vitiate criminal proceedings. In an opinion by Mr. Justice Cardozo, the Supreme Court of the

United States recognized that an accused has not been deprived of due process of law, even though his conviction be erroneous, unless his trial has been void of "the very essence of a scheme of ordered liberty" and in violation of "principles of justice so rooted in the traditions and conscience of our people as to be regarded as fundamental." In *Lisenba* v. *California,* 314 U.S. 219, it is stated that as applied to a criminal trial "denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it * * * [the court] must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial."

Questions arising from what has been referred to as a "conflict between the constitutional guarantees of fair trial and free press" have recently come in for serious thought and study. (See, for example, Ottenbourg, "Fair Trial and Free Press: A New Look in 1954," 40 American Bar Association Journal 838.) Two recent cases of the Supreme Court of the United States, *Shepherd* v. *Florida,* 341 U.S. 50, and *Stroble* v. *California,* 343 U.S. 181, show that no very definite rules have been formulated and, as is true of all due process questions, the many problems will find solution only on a case-by-case basis.

I agree with much of what is said in the majority opinion relative to the character of these newspaper articles, and were this case here on direct appeal from the conviction would be inclined to the position that the failure to declare a mistrial or to grant a new trial was reversible error. However, more should be required now, since by the very statute which the petitioner invokes he is confined to constitutional questions.

Obviously the mere reading of a newspaper article by the jurors which reports the trial proceedings, or even indicates what the parties intend to prove, would not in and

of itself so fatally infect the trial as to deprive the accused of due process of law. Moreover, even if the comments were inflammatory and prejudicial as in this case, an attempt must be made to measure their impact upon the jury in the context of what action was taken by the trial judge. Here it is to be noted that after it came to his attention that each of the jurors had read one or both of these newspaper articles, the trial judge made a reasonable effort to prevent, or at least minimize, their effect upon the jury. He questioned the jurors and received answers from them that they would not be influenced thereby. Further, he instructed the jury to ignore the articles, to regard them as unfair and to consider only the evidence introduced in the case. He thus did everything he could reasonably do to prevent these articles from influencing the verdict. It has been recognized that a matter which otherwise might be a violation of due process may in certain instances be cured by proper instructions to the jury. See Scott, "State Criminal Procedure, The Fourteenth Amendment, and Prejudice," 49 Northwestern University Law Review 319.

Under these circumstances, I do not believe it can be said that the matters complained of *necessarily* prevented a fair trial. In my opinion, the petitioner has failed to demonstrate so shocking an abuse of discretion upon the part of the trial court as to nullify the conviction upon constitutional grounds.

Mr. JUSTICE KLINGBIEL, also dissenting.