THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) No. 99 CR 6530

)

MICHAEL SMITH, ) Honorable

) Michael P. Toomin,

Defendant-Appellant. ) Judge Presiding.

JUSTICE REID delivered the opinion of the court:

Following a jury trial, the appellant, Michael Smith, was found guilty of first degree murder and armed robbery.  The trial court subsequently sentenced Smith to serve 50 years' imprisonment for first degree murder and 20 years' imprisonment for armed robbery with the sentences running concurrently.  On appeal, Smith maintains: (1) 
he received an unfair trial because he did not have an impartial jury, 
(2) 
the trial court improperly excluded his prior consistent statements as inadmissible hearsay
, (3) 
he was denied his fundamental right to be present at all stages of his trial
, (4) 
the prosecutor elicited irrelevant and prejudicial testimony from the victim's wife and compounded the error by making improper comments during his opening and closing arguments
, (5) the prosecutor improperly shifted the burden to the defense during his closing and rebuttal arguments, (6) the trial court improperly included "or" between the factors of 

Illinois Pattern Jury Instructions, Criminal, No. 3.15 (3d ed. 1992)(hereinafter IPI Criminal 3d No. 3.15.) when it gave the instruction to the jury and (7) he received ineffective assistance of counsel due to a variety of errors committed by his trial lawyer.  For the reasons that follow, we reverse the decision of the trial court and remand this matter for a new trial.

BACKGROUND

On the afternoon of January 19, 1999, Lester Mosbacher died from gunshot wounds he sustained during an armed robbery which occurred that morning.  The incident took place at a currency exchange that Mosbacher owned which was located at 12719 South Halsted Street, in Chicago, Illinois.

At trial, Rose Brown testified that she was driving her son to school on the morning of January 19, 1999.  As she was driving, the traffic came to a stop and Brown's car was subsequently positioned in front of Mosbacher's currency exchange.  At that time, Brown noticed a man walking through "a big hole in the front window" of the currency exchange.  

Brown said that the man was wearing black boots, black pants and a black jacket with a hood.  She testified that the man was black, approximately 5 feet 7 inches tall, and weighed about 150 pounds.  Almost 10 seconds later, Brown observed a second man exit the currency exchange through the same window.  

Brown said that the second man was wearing black boots, blue jeans, a red shirt and a jacket.  She testified that the second man was black, approximately 5 feet 4 inches to 5 feet 5 inches tall, wore his hair in an Afro and had "a huge nose and huge lips."  Brown identified the second man as the defendant.

After she took her son to school, Brown returned to the currency exchange and spoke to the police.  Brown then accompanied the police to Area 2 police station, where she helped the authorities to create a composite sketch of the defendant.

On January 22, 1999, Detectives John McCann and David Fidyk visited Brown at her home.  There, the detectives showed Brown a photographic lineup.  Brown identified a picture of Smith as the person she saw on the day of the occurrence.  On February 12, 1999, Brown went to Area 2, where she again identified Smith in a lineup as the shorter offender exiting the currency exchange.

At trial, Officer Richard Clark, from the Calumet Park police department, testified that on February 12, 1999, at approximately 11:40 a.m., he was on patrol when he saw Smith walking down the street.  Clark was aware that Smith was wanted for questioning by the Chicago police department.  Clark subsequently placed Smith under arrest.  At the time, Smith identified himself as Shawn Cotton.

Detective McCann testified that on February 12, 1999, he learned that Smith had been stopped in Calumet Park.  Shortly after 12 noon, McCann made arrangements with Clark to have Smith transported to Area 2.  McCann estimated that at the time, Smith was 6 feet 1 inch and weighed approximately 150 to 160 pounds.  At Area 2, Smith was placed in a conference room.

At approximately 1:15 p.m., McCann had a conversation with the defendant.  McCann testified that he initially advised Smith of his 
Miranda
 rights.  The conversation between McCann and Smith lasted approximately 15 to 20 minutes.  After their conversation, Smith was taken to the 5th District lockup to have his fingerprints and photograph taken.  At approximately 7 p.m., Brown identified Smith from a lineup.  

Assistant State's Attorney (ASA) Michael Hood testified that on February 12, 1999, at approximately 11:15 p.m., he interviewed Smith for approximately 45 minutes.  Detective McCann and ASA Sharon Opryszek were also present.  At the end of the interview, Hood did not approve any charges against Smith. 

At trial, Detective Fidyk testified that on February 13, 1999, at approximately 8:30 a.m., he had a conversation with Smith.  Initially,
 Fidyk said that he asked Smith if he needed to go to the bathroom and if he wanted any water and offered him something to eat.  Consequently, Fidyk said, Detective Mike McDermott went to get Smith something to eat for breakfast. 

Fidyk advised Smith of his 
Miranda
 rights.  
Smith then told Fidyk that on the morning of January 19, 1999, he left his house at approximately 7:30 a.m. to meet a friend.  As he waited for his friend on 127th Street and Halsted Street, he saw two individuals known to him as Christopher Hamilton and Antoine Jackson walking toward the currency exchange.  At this time, Smith saw Mosbacher drive up in his car.  Mosbacher sat in his car and made a telephone call on his cell phone.  

After Mosbacher exited his vehicle, Smith began to walk toward a bus stop on Vermont Avenue when he heard gunshots.  After hearing the shots, Smith ran from the scene.  Later that day, Smith said that he went to Peoria, Illinois, with a friend named Lashonda.  He returned a few days later on January 21, 1999.  When their conversation ended, McDermott had returned from McDonald's.  Smith was then given his food and the detectives left to allow him to eat.

At approximately 11 a.m., Fidyk and McDermott spoke with Smith again.  Smith was again advised of his 
Miranda
 rights.  Smith told the detectives that he wanted to make some changes to what he had told them earlier.

Smith said that he knew Jackson and Hamilton.  On the morning of the incident, they approached Smith and asked him if he would act as a lookout.  Shortly thereafter, Mosbacher pulled up in his car.  Mosbacher exited his vehicle and started walking toward the door of the currency exchange.  At this time, Jackson and Hamilton approached Mosbacher and forced him through the door of the currency exchange.  A short time later, Smith said that he heard gunshots and ran from the scene.

After this conversation, Fidyk and McDermott took Smith to 11th and State Street to speak with an investigator.  Fidyk estimated that they arrived there at approximately 12:30 p.m.  Fidyk then introduced Smith to police investigator
 Robert Tovar.  Tovar interviewed Smith for approximately an hour.  Neither Fidyk nor McDermott was present during Tovar's interview with Smith.

Tovar testified that his interview with Smith began at approximately 12:45 p.m.  Tovar initially advised Smith of his 
Miranda
 rights and had the defendant sign a 
Miranda
 form.  Smith 

informed Tovar that on the morning of the incident, he was inside the currency exchange with Jackson and Hamilton.  The three were fighting with Mosbacher.  They were trying to force Mosbacher into the rear rooms of the currency exchange.  Mosbacher did not want to relinquish his keys and was swinging his briefcase at Jackson and Hamilton.  

Tovar testified that Smith told him:  "Jackson then attempted to give the handgun, the gun to Mr. Smith.  Then there were some shots that were fired, some more shots were fired.  Mr. Smith said that the man, referring to the victim again, didn't want to give up his wallet and he said then I picked the gun [up] and gave it back to Jackson."

After listening to his statement, Tovar retrieved Detectives Fidyk and McDermott.  Smith then repeated this statement to the detectives.  Thereafter, Smith was taken back to Area 2. 

Detective McDermott testified that at approximately 5 p.m. on February 13, 1999, he had a conversation with Smith at Area 2.  The only other person who was present was Fidyk.  At that time,
 Smith admitted that he went inside the currency exchange with Hamilton and Jackson with the intent to commit a robbery.  The three men followed Mosbacher inside the currency exchange, where a scuffle ensued.  Mosbacher was forced to the inner door of the currency exchange where another scuffle started.  Jackson then took out a handgun and shot Mosbacher in his right arm.  In response, Hamilton fled the currency exchange.   Smith and Jackson then forced Mosbacher inside the inner area of the currency exchange.  Once inside, Jackson demanded Mosbacher's wallet.  Jackson stood over Mosbacher and shot him in the head.  Smith said that he and Jackson then fled the inner part of the currency exchange when they realized that they were locked inside.  Jackson picked up a chair and threw it through the window so that both men could climb out and flee.  Later that day, he and his girlfriend left Chicago.  

McDermott testified that after the interview, Fidyk contacted the State's Attorney from the felony review unit and requested that they conduct an interview of the defendant.  McDermott said that ASA Hood and ASA Opryszek responded to Fidyk's request.

At approximately 8 p.m., Hood returned to Area 2 to speak with Smith.  During this interview, Fidyk and ASA Opryszek were present.  Hood testified that he advised Smith of his 
Miranda
 rights.  Smith then gave Hood a statement.  
After Smith gave his statement, Hood said that he spoke with the defendant alone.  At this time, Hood asked Smith how he had been treated by the police.  Smith said that he had been treated fine and that Detective Fidyk was "very nice" to him.

Hood requested that Smith give a recorded statement.  Smith chose to give his statement to a court reporter.  Opryszek and Fidyk were also present when Smith gave his court-reported
 statement.  After the statement was typed, Hood reviewed it with Smith.  At this time, Smith initialed corrections and signed each page of the 34-page statement. 

At the beginning of the statement is the defendant's signed waiver of his 
Miranda
 rights.  In the statement, Smith said that on the morning of January 19, 1999, at approximately 7:30 a.m., he was standing at a pay phone waiting on a friend who was arriving by bus.  Smith was wearing "dark blue jeans, a black Yankee's jacket with blue in it and a blue sweater with red in it."  

As he was waiting, Smith was approached by Hamilton and Jackson.  Smith testified that he had known both Hamilton and Jackson, and after greeting one another, Jackson informed Smith that he needed him "for security."  Smith said that Jackson and Hamilton planned to rob the currency exchange and wanted him to act as a lookout.  Smith agreed.  Smith admitted that he knew that Jackson carried a gun.

The three men then waited for Mosbacher.  After he arrived, Mosbacher sat in his car and made a telephone call from his cell phone.  When he exited his vehicle, Jackson and Hamilton forced Mosbacher into the currency exchange.  Smith then followed the men inside.  

Jackson and Hamilton were tussling with Mosbacher as they were attempting to force him through the door that led to the inner area of the currency exchange.  During this time, Smith continued to act as a lookout by watching for possible trouble through the window of the currency exchange.  

During the scuffle, Mosbacher was swinging his briefcase and yelling at the men to leave when the gun went off.  Smith said that Mosbacher was shot in his right arm.  At this point, Hamilton fled from the currency exchange.  Jackson then pushed Mosbacher into the rear of the currency exchange.  In the rear, another tussle ensued between Jackson and Mosbacher.  Eventually, Mosbacher fell to a knee.  At this time, Jackson shot Mosbacher in the head.  Jackson then took Mosbacher's wallet out from his pocket.  

The two men then fled to the outer area of the currency exchange, where they discovered that they were locked in.  Jackson threw a chair into the window.  They then climbed through the hole in the window and fled from the currency exchange.  

At the end of his statement, Smith said that he was treated well by the police and that he was not threatened or forced to talk to the police.  

At trial, Jackson made an appearance in the courtroom so that the jury could compare Smith's and Jackson's height.  Detective McCann noted that Smith was approximately five inches taller than Jackson.  

Smith testified in his own defense.  It was Smith's testimony that after he was arrested, he made a request to make a telephone call.  In response, Detective McDermott told Smith that "he wasn't giving [him] shit" and punched him in the face and slammed his head against the wall.  Smith said that on another occasion, Detective McCann pushed a table into his chest and throat.  

On direct examination, Smith acknowledged that he went to 11th and State Street to take a polygraph examination which was administered by Officer Tovar.  Smith also acknowledged that he was given the results of that examination.  However, Smith denied making a statement to Tovar after receiving the results of the polygraph examination.  Smith testified that he in fact never gave Tovar a statement.   

Before he gave his court-reported statement, Smith said that he was coached by Hood and Fidyk.  When he reviewed the statement that he gave to the court reporter, Smith said that ASA Hood instructed him as to what corrections to make to the statement.  Smith denied that he was ever given his 
Miranda
 rights until the court-reported statement was taken.

When asked why did he told Hood that he was standing at the pay phone waiting for a friend on the morning of the incident, Smith responded, "Because the detectives and Mr. Hood told me that if I -- if I said it like that, as to where I wouldn't be involved, I never shot, I never had the gun, then I can go home and they can use me as a witness or something."

Smith testified that he did not participate in the armed robbery that led to Mosbacher's death because he was in Peoria, Illinois, on the day of the incident.  

At the conclusion of trial, the jurors retired to deliberate.  After several hours, the jury was sequestered for the night.  The trial court had earlier sent the two alternate jurors home with instructions that they were not the discuss the case with anyone.  The following morning, Judge Toomin was informed by the foreperson, juror Geneva Calloway, that another juror, Arnetta Harris, said that she had previously seen Smith, Hamilton and Jackson together.  Calloway said that Harrison also elaborated on Hamilton's height in comparison to Smith's and made gang implications.   

In chambers, juror Harris informed
 the attorneys and trial judge that she recognized Smith from her sister-in-law's neighborhood.  On occasion she saw Smith, Hamilton and Jackson selling drugs.  Harris said that she told an alternate juror, Mary Elmore, that she saw Smith, Hamilton and Jackson together, selling drugs.  As to the other jurors, Harris said that she told them that she had seen Hamilton and Jackson together, the three were "real good friends," Smith used drugs and Hamilton is taller and heavier than Smith.  The defendant was not present during this 
in
 
camera
 
voir
 
dire
 of the juror.

Thereafter in chambers, 
Judge Toomin and the attorneys, without Smith's presence, questioned each juror individually about what Harris told them.  The jurors recalled different things conveyed by Harris, which ranged from things such as: Smith was a bad kid, Hamilton was taller and heavier than Smith, and the three men knew and hung around one another.  Two jurors who remained for the verdict heard Harris say that Smith and the others were gang members. 

The trial court dismissed juror Harris.
  Juror Kevin Fowler indicated that he could no longer be impartial, and he was also  dismissed. 
 Juror Janice Harbold informed the trial court that "I think it weighs things negatively."  She also said, "You know, whether -- how far negatively, but it affected me."  However, Harbold
 ultimately said that she could make a decision based solely on the evidence presented at trial.  She was allowed to stay on the jury along with 
the remaining jurors who also indicated that they could disregard any information not presented as evidence at trial.
 
 The two alternates were then called in to replace Harris and Fowler.
 

Neither the State nor defense counsel objected to the court's actions.
  In fact, defense counsel stated at one point during the discussion between the attorneys and the trial judge regarding what should be done, "Well, I think that every effort should be made to maintain -- to preserve this trial and avoid a mistrial." 

After being instructed to begin its deliberations anew with the two alternate jurors, the jury returned a guilty verdict for first degree murder and armed robbery.  The trial court subsequently sentenced Smith to serve 50 years' imprisonment for first degree murder and 20 years' imprisonment for armed robbery, with the sentences running concurrently.  

The trial court denied Smith's posttrial motion for a new trial.  Smith then timely filed a notice of appeal.

ANALYSIS

Smith argues that he did not receive a fair trial as a result of not having an impartial jury.  Smith contends that when juror Harris informed some of the other jurors that she knew Smith, had seen Smith with Hamilton and Jackson on previous occasions together selling drugs, expounded on Hamilton's height as it related to Smith's, thus possibly bolstering Brown's identification of Smith as the shorter individual leaving the currency exchange and related to the other jurors that the three men were gang members, which was information that was barred in a motion 
in
 
limine
, she negatively influenced the other jurors.  Smith argues that this had the effect of denying him a fair trial.

Although Smith's trial counsel did not request a mistrial after learning of juror Harris' statements during deliberations and did not raise the issue in his motion for a new trial, we will review this issue under the plain error doctrine. 
 Plain error may be invoked in two circumstances: (1) where the evidence is closely balanced, or (2) where the error is of such magnitude that there is a substantial risk that the accused was denied a fair and impartial trial, and remedying the error is necessary to preserve the integrity of the judicial process.  
People v. Vargas
, 174 Ill. 2d 355, 363 (1996).  
Here, this issue should be examined under the plain error exception to the waiver rule because it affects Smith's constitutional right to a fair trial. See 
People v. Garcia
, 231 Ill. App. 3d 460, 474 (1992); 
People v. Metcalfe
, 202 Ill. 2d 544, 551-52 (
2002).

The right to a jury trial guarantees to a criminal defendant a fair trial by a panel of impartial jurors.  Impartiality is not a technical concept.  Rather, impartiality is a state of mind, or a mental attitude.  The trial court must ascertain a  venireperson's state of mind from the entire 
voir
 
dire
 examination, giving the venireperson's statements the weight to which they are entitled under the circumstances.  A person is not competent to sit as a juror if that person's state of mind or mental attitude is such that, with him or her as a member of the jury, the defendant will not receive a fair and impartial trial. 
People v. Kuntu
, 196 Ill. 2d 105, 126-27 (2001), 
citing 
People v. Peeples
, 155 Ill. 2d 422, 462-63 (1993) (collecting cases); 
People v. Cole
, 54 Ill. 2d 401, 411, 413-15 (1973).  

"The burden of showing that a venireperson possesses a disqualifying state of mind is on the party making the challenge.  The trial court must determine the juror's disqualifying state of mind based on the evidence; mere suspicion of bias is not evidence.  The determination of whether or not the venireperson has the state of mind that will enable him or her to give to a defendant a fair and impartial trial rests in the sound discretion of the trial court."  
Kuntu
, 196 Ill. 2d at 127, citing 
Peeples
, 155 Ill. 2d at 463.  "'Because the trial court is in a superior position to observe the venireperson's demeanor and evaluate the candor of the responses, the trial court's determination will not be set aside on review unless it is against the manifest weight of the evidence.'"  
Kuntu
, 196 Ill. 2d at 127, 
quoting 
People v. Pasch
, 152 Ill. 2d 133, 168 (1992); accord 
Peeples
, 155 Ill. 2d at 463, 
Cole
, 54 Ill. 2d at 414-15.

"A fair trial requires the participation of impartial jurors.  (
People v. Jones
 (1985) 105 Ill. 2d 342
.)  If it is alleged that the jury has been improperly influenced by allegedly prejudicial material like a newspaper article, the trial court must determine whether such material prejudiced the defendant.  
People v. Trejo
 (1976) 40 Ill. App. 3d 503
.)  The determination rests within the sound discretion of the trial court.  (
People v. Malmenato
 (1958) 14 Ill. 2d 52
.)  Its determination will not be set aside absent an abuse of that discretion.  
People v. Hryciuk
 (1954) 5 Ill. 2d 176.

To warrant a reversal on this issue, it must reasonably appear that the jurors, or at least some of them, have been influenced or prejudiced so that they can no longer be fair and impartial.  (
People v. Malmenato
 (1958) 14 Ill. 2d 52, 65
.)  A juror's statement upon interrogation that he has not been influenced should not be considered conclusive, for jurors themselves are incapable of knowing the effect which prejudicial matters may have upon their unconscious minds.  (
People v. Hryciuk
 (1954) 5 Ill. 2d 176
.)  The determination of prejudice then rests not only upon what the jury says, but also upon the nature of the material and all the facts and circumstances in the record.  (
People v. Lampson
 (1972) 6 Ill. App. 3d 1099
.)  However, not every situation in which extraneous or unauthorized information reaches the jury results in prejudicial error.  
People v. Collins
 (1979) 71 Ill. App. 3d 815
."  
People v. Rogers
, 135 Ill. App. 3d 608, 625-26 (1985).

In 
People v. Keegan
, 52 Ill. 2d 147 (1971), the trial court denied the defendant's motion for a mistrial which was made during jury selection.  On appeal, the defendant argued that the trial court erred.

On the day that the trial commenced, the only evening paper in the county where the trial occurred printed an article which reported that the defendant, who was accused of taking indecent liberties with a child, was named in four other similar complaints.  In response, before opening statements were given, defense counsel moved for a mistrial and requested permission to interview each juror.  Ten of the jurors said that they had not read the article.  The other two jurors said that they had read the article but that it would not influence their decision.   

In addition to explaining that the defendant had been named in four similar complaints, 
the article also stated that the police had found color slides of nude and partially nude children in Keegan's residence, although the trial court had previously suppressed this evidence.  The 
Keegan
 court held that it was not ready to speculate as to what the verdict might have been if the two jurors had not read the prejudicial article and held that the defendant did not receive a fair trial.  
Keegan
, 52 Ill. 2d at 155-56.

In 
Rogers
, the defendant was convicted of attempted rape.  On appeal, the defendant argued that he did not receive a fair trial due to the jury's exposure to a newspaper article about the defendant during the course of the trial.  Because of the article, one of the jurors knew of the defendant's prior arrest for rape.  This juror subsequently told five other jurors.  Also, the same juror and another juror knew that the defendant had been released from prison on the day of the incident.  The latter fact was described as "unduly prejudicial" by the trial court when it conditionally granted the defendant's oral motion 
in
 
limine
 to preclude the State from introducing that fact during trial.  
Rogers
, 135 Ill. App. 3d at 627.

In finding that the defendant had been prejudiced, the 
Rogers
 court wrote:  

"Considering these facts and circumstances, the defendant did not have a fair and impartial jury. The article revealed a prior arrest for rape and information specifically excluded from the trial by the court.  It was not a harmless error despite the evidence against the defendant.  See 
People v. Jones
 (1985) 105 Ill. 2d 342
."  
Rogers
, 
135 Ill. App. 3d at 628.

In 
Hryciuk
, the defendant was convicted by a jury of rape and was sentenced to life imprisonment.  During the trial, the jurors were not sequestered and were allowed to return to their homes during the evenings.  On the evening before the last day of the trial, two daily newspapers published articles about the trial and stated therein that the defendant had confessed to two murders for which the State planned to try him and would seek the death penalty if the defendant's confession withstood the legal attack made on it in the rape case.  One of the newspapers reported that the defendant boasted of attacks on more than 50 women at the time of his arrest and that the defendant had been arrested while trying to attack a young woman.

It was learned that each of the jurors had read one or both of the articles.  The trial court then interrogated the jury, as a group, and received assurances from some of the jurors that they could ignore the articles and not allow themselves to be influenced by them.  The jury was subsequently admonished by the trial court to ignore the newspaper articles, to consider them false and unfair and to only 
consider the evidence introduced at trial. 

The 
Hryciuk
 court held that the newspaper accusations about the defendant were prejudicial and that the trial court had abused its discretion when it determined that the defendant had received a fair trial.  
Hryciuk
, 5 Ill. 2d at 185.

In the instant case, 
juror Harris' comments clearly were prejudicial to Smith. 
 
Harris informed the other jurors that 
Smith was a bad person, a gang member and a drug dealer.  This information was extremely prejudicial and irrelevant.  There was absolutely no evidence introduced at trial that the robbery at the currency exchange was gang or drug related.  In addition, the trial court had specifically barred the introduction of gang evidence when it granted Smith's motion 
in
 
limine
.

Harris' comments about the three men knowing one another and being in a gang also implied to the jurors that the three men were often together.  This could easily lead the jurors to infer that the men in fact
 robbed the currency exchange together because of their past history.

Additionally, Harris told the other jurors that Hamilton was taller and heavier than Smith.  This information was very damaging to Smith's defense.  It was Brown's testimony that Smith was the shorter perpetrator that she saw exiting the currency exchange.  However, at trial, the jurors learned that Smith is actually several inches taller than Jackson, who also left the currency exchange by going through the broken window.  Harris' comments had the affect of potentially bolstering Brown's testimony because the jurors could infer that Hamilton and not Jackson was the taller man exiting the currency exchange with Smith. 

It is true that the trial judge conducted an extensive 
voir
 
dire
 and received assurances from the 
remaining 10 jurors who said that they could make a fair decision and the judge admonished all 12 jurors to base their deliberations solely on the evidence introduced at trial.  It is also true that defense counsel and the State urged the trial court to allow the deliberations to proceed with the alternates' participation.  However, in considering the nature of juror Harris' comments regarding her personal knowledge of Smith, Jackson and Hamilton, we simply cannot say that Smith was not prejudiced by this information.  Juror Harbold's statements to the court are very enlightening.  Although juror Harbold stated that Harris' statements had a negative effect on her, she was allowed to remain on the jury because 
she assured the trial court that she would not be influenced by Harris' comments and that she would base her decision solely on the evidence admitted at trial.
  We find this to be inadequate, even though defense counsel specifically said he believed Harbold was truthful.  

"It has been held that jurors themselves are incapable of knowing the effect which prejudicial matters might have upon their unconscious minds.  [Citations.]  It has been held that the mere possibility of prejudice is sufficient for the court to grant a new trial in a murder case [citation] and even in a lesser offense.  [Citation.]"  
People v. Hryciuk
, 5 Ill. 2d 176, 184 (1955).

For the reasons stated herein, we reverse defendant's convictions and remand this matter for a new trial.  For purposes of double jeopardy, we find that there was sufficient evidence for a jury to find defendant guilty beyond a reasonable doubt.  
People v. James
, 331 Ill. App. 3d 1064, 1070 (2002).  Upon retrial, we instruct the trial court to leave out the connector "or" between the factors listed in IPI Criminal 3d No. 3.15.
  In view of our decision to reverse and remand, we need not reach the merits of the remaining issues raised.

CONCLUSION

For the foregoing reasons, we reverse the decision of the trial court and remand this matter for a new trial.

Reversed and remanded.

Campbell, P.J. and Quinn, J., concur.