THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOSEPH B. COLLINS (Impleaded), Defendant-Appellant.

First District (5th Division)    No. 77-169

Opinion filed May 11, 1979.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and J. Jonathan Regunberg, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and received a sentence of 50 to 100 years. On appeal, he contends he was denied a fair trial because (1) the prosecutor asked him questions on cross-examination which insinuated that the co-defendants had implicated him in the crime, but failed to prove such accusations on rebuttal, (2) the prosecutor's closing argument shifted the burden of proof regarding missing witnesses to defendant, (3) during the trial, members of the jury read newspaper accounts of a co-defendant's trial and conviction and, (4) the trial court instructed the jury on felony murder even though there was no evidence that defendant was attempting to commit armed robbery. Defendant further contends that (5) the trial court erred in allowing expert testimony which was based upon speculation, and (6) his sentence is excessive.

The following pertinent evidence was adduced at trial.

*For the State*
  *William Leubscher, Evergreen Park Police Officer*
  At approximately 11:40 p.m. on July 19, 1973, he received a radio

message concerning a shooting and proceeded immediately to the M & R Theater in the Evergreen Plaza Shopping Center. When he entered the theater lobby he observed an elderly white male, later identified as Karl Hyle, lying on his back just outside of the office. He and Officer Watson, who had also arrived, attempted to revive the man, but realized he was dead. He observed a "spent bullet casing" on the floor about a foot from the dead man's body. The theater office is located in the northeast corner of the lobby and has a safe on the south wall. He observed a hole on the east wall of the office, directly behind a desk and chair. Hyle's body was taken to a hospital where Leubscher removed the blood soaked clothes and observed a hole in the left chest and a laceration along the left temple.

*John Charters, Assistant Manager of the M & R Evergreen Park Theater*

He was on duty during the day of July 19, 1973, and was relieved by Karl Hyle at approximately 4 p.m. At that time he gave Hyle the key to the office safe. Two keys are required to open the safe, the second being in the possession of a messenger from the armored guard service which picks up the money. At closing time the manager would deposit the money from the cashier into the safe.

*John Watson, Evergreen Park Police Officer*

He substantially corroborated the testimony of Officer Leubscher. After attempting to assist Hyle, he recovered an expended cartridge casing from the floor approximately a foot from Hyle's body and a spent bullet from the floor in the office. He identified these at trial.

*Jean Cronin*

She resides at 9831 S. Leavitt in Chicago. At about 8:30 a.m. on July 20, 1973, she discovered a shoulder bag on the driveway with a package of cigarettes and an open box of bullets lying nearby. She called the police and two officers arrived. She observed one of the officers inspect the items in the bag, including a card with names and numbers. The name "Collins" was definitely on the card. The police took the shoulder bag and left. Several minutes later Officer Thomas Faragoi and another officer arrived and proceeded to search her backyard and alley area.

*Thomas Faragoi, Chicago Police Officer*

At approximately 9 a.m. on July 20, 1973, he went to the Evergreen Park Police Station, had a conversation with several officers and at approximately 10:30 a.m. proceeded to 9831 South Leavitt. Officer Shay arrived five minutes later and the two officers began to search the area for evidence or possibly a suspect. As they were conducting the search, he observed a male Negro running northbound on Hamilton Avenue, the street east of Leavitt. He immediately returned to the squad car and approximately 10 minutes later he and Shay arrested Collins in a restaurant at 2139 W. 95th Street.

*Kenneth Christiano, Chicago Police Investigator*

He interviewed Joseph Collins at the Evergreen Park Police Station at approximately 10:30 p.m. on July 20, 1973. Collins admitted to taking a pouch into the theater, but stated that it was "Archie's." Collins denied having a gun. Christiano told Collins that "if the gun had not been fired we could prove it with a test." Collins then told him that he had put the gun underneath some high bushes near an alley where he had stayed all night. Collins had dropped the pouch while running through a yard and into the alley. Christiano proceeded to 9827 S. Leavitt where he found a 9mm Browning automatic pistol buried under the bushes in the yard. The pistol was "in the cocked position with the safety off." He identified People's Exhibit 20 as this pistol.

On cross-examination he testified that Adrienne Taylor had told him that Collins had entered the theater with a pouch.

*James O'Neill, Chicago Police Officer*

While on patrol at approximately 11:40 p.m. on July 19, 1973, with Officer Urban, he "received a simulcast of a robbery and shooting" at the Evergreen Park Theater. He also received a physical description of two suspects. A short time later he observed a "husky male Negro," later identified as Archie Smith, running across 96th Street near Hoyne Avenue and proceed to the front porch of 9558 S. Seeley. After attempting to open the door, Smith "threw something into the yard" and started to jump off the porch. O'Neill then arrested Smith. Smith was wearing a blue and white striped knit shirt and dark pants.

*James O'Leary, Chicago Police Officer*

He responded to a call for assistance from O'Neill and Urban, arriving a few minutes later. He searched the yard just north of 9558 S. Seeley and found a "Star nine millimeter blue steel automatic pistol," identified as People's Exhibit 24.

*Cathy Dempsey*

On the evening of July 19, 1973, she went to the M & R Theater with Jean Ryan, Peggy Kilmartin and Nancy Sullivan. When the movie ended at approximately 11 p.m. to 11:30 p.m. the girls went to the lobby to call for a ride home. Nancy and Peggy went to the south side of the lobby to call, while she and Jean went to the north side to wait. She observed two men standing near Nancy and Peggy. One man was of average height and "sort of stocky." He was dressed in a blue and white shirt, a blue and white checked hat, platform shoes and sunglasses. The other man was taller and slimmer. Peggy and Nancy completed the phone call, and returned to the north side of the lobby. The girls then walked outside and waited near the theater doors. A few minutes later she looked back into the lobby and observed the two men standing at the office door. The

lobby was well lit. A minute later she heard a "pop," and looked back into the office. As the two men ran from the office the manager screamed and fell over the desk. She looked away from the men. When she heard someone say "move," she turned around and saw the same two men run out the north exit doors and down the stairs.

On cross-examination she testified that the men came within 5-10 feet of her as they ran from the theater.

### Peggy Kilmartin

She accompanied Cathy Dempsey and the other girls to the Evergreen Park M & R Theater on July 19, 1973. When the movie ended at approximately 11 p.m. or 11:30 p.m. she and Nancy Sullivan went to the south side of the theater lobby to make a phone call. As she was standing near the phone she observed two black men standing about five feet from her. One man was of medium height, was wearing a blue and white striped shirt, and was shorter than the second man. She and Nancy returned to the north side of the theater, joined the other girls, and walked outside. A few minutes later she heard a "bang," and a few seconds later heard someone say, "move:" She turned around and saw the two black men that she had seen earlier standing at the doors. The taller man "appeared to be waving a gun at us." She looked back into the theater and saw a white man falling over the desk and heard a scream.

### Mark Zubor, Assistant State's Attorney

He interviewed Joseph Collins at the police station on July 20, 1973. After being informed of his *Miranda* rights, Collins stated that he was at the theater, heard a shot and ran. Zubor told Collins that he had already talked with another man who had been arrested "in relation to the shooting and attempted armed robbery at the M & R Theater." He then asked whether Collins wanted to change his story. Collins then admitted that Archie Smith did the shooting. He further admitted that he had made arrangements to meet Smith at the theater. Collins at first stated he had taken a bus to the theater, but later admitted that he and Archie had arrived at the theater together in a car driven by Adrienne Taylor. Collins stated that Smith entered the theater first while he waited outside until Smith opened the door for him. Collins entered the theater, purchased a soda from a machine and went into the washroom. As Collins left the washroom and walked toward the doors, he saw Smith entering the manager's office. Collins heard a shot and ran out of the theater. Collins then told Zubor, "I thought Archie and I were just going to look at the set up for the place to rob it. I didn't know Archie was going to rob it then."

He further testified that he saw Archie Smith on July 20, 1973, and that Smith was wearing a blue and white short sleeve knit shirt.

*Donald Smith, Chicago Police Officer and Firearms Expert*

In his opinion the spent cartridge and bullet recovered from the theater office were fired from the Star 9 millimeter blue steel automatic pistol recovered by Officer O'Leary at the time of Smith's arrest.

*Dr. Edward Shalgos*

While employed as a pathologist for the Cook County Coroner he performed an autopsy on Karl Hyle on July 20, 1973. In his opinion Hyle's death was caused by the passage of a bullet through his body, lacerating the heart, lungs and liver. The wound to Hyle's head showed typical characteristics of gun butt trauma applied by someone facing the left side of the victim's head and striking him forcefully from above in a downward motion. The pistol recovered from Smith could not possibly have been the cause of the head wound because it is significantly narrower than the wound and the butt is too sharp. However, the pistol recovered from under the bushes by Officer Christiano, or another weapon absolutely like it, did cause the head wound. This opinion was based upon the measurement of the gun butt and the pattern of the edge of the butt.

*For the Defendant*

*Joseph Collins, on his own behalf*

On the evening of July 18, 1973, he accompanied Archie Smith and Adrienne Taylor to the Evergreen Park Theater to watch a movie. They left the theater when the movie ended at about 12 midnight. On the next evening, July 19, 1973, he ate dinner with Smith and Taylor. At approximately 10:15 p.m. or 10:30 p.m. they again drove to the Evergreen Park Theater. He objected to going to the theater because he had to meet a friend. Smith replied, "you know you [*sic*] messing me up." Taylor parked the car at the theater and Smith got out. Approximately 15 or 20 minutes later, between 11:15 p.m. and 11:30 p.m., he told Taylor he was "going to get Archie." Approaching the south entrance doors of the theater, he saw Smith on the telephone in the lobby. He waited outside for about five minutes until a black man appearing to be about 60 years old opened the door, allowing him to enter the theater. Smith, who was still on the phone, signaled him to wait a moment. He asked Hyle if he could use the washroom, received an affirmative reply, bought a coke from a machine and went to the washroom. He left the washroom 5 or 10 minutes later, approached Smith, but returned to the washroom to "pick up my pop." He came out of the washroom again, told Smith that he and Taylor were ready to leave, and started to leave. As he walked toward the exit doors he heard Hyle yell, "I don't have any money," followed by a shot. Turning around, he saw Smith at the manager's desk. He could not tell if Smith had a gun in his hand. The manager was behind the desk. He

immediately ran out of the theater and continued running for about five minutes. He was not familiar with the area and did not know where he was going. Smith was about 30 feet behind him. He thought the police saw them cross a street so he ran into an alley and hid for 10 or 11 hours. When he came out he went to 95th Street where he was arrested while eating breakfast.

While he was at the police station following his arrest, Investigator Christiano showed him a gun and asked whether it was his. He told Christiano he did not have a weapon. Defendant further testified that he did not own the gun identified as People's Exhibit 20 and was not in possession of that gun on July 19, 1973. He did not strike or attempt to rob Hyle.

On cross-examination he admitted telling Zubor that they went to the theater on July 19, 1973, because "Smith wanted to look at the safe." Smith did not talk to him about the layout of the theater. He did not carry a shoulder bag or leather pouch into the theater. He denied carrying a pouch into the washroom removing a gun and giving the gun to Smith. Smith, however, was carrying a shoulder bag. He did not take any guns into the theater and did not strike Hyle. He also denied telling Christiano that he dropped a pouch near the bushes where he slept or where to find a gun.

Opinion

Defendant first contends that he was denied a fair trial where the prosecutor on cross-examination asked defendant certain questions which insinuated that the co-defendants had implicated him in the crime, but failed to prove such insinuations in rebuttal. On cross-examination defendant was asked whether he carried a pouch into the theater and, while in the washroom, gave Smith a gun from that pouch. He was also asked a series of questions referring to whether he and Smith examined and discussed the layout of the theater in the presence of Taylor. Neither Smith nor Taylor, who were tried in a separate proceeding, were called in rebuttal by the State.

However, defendant has clearly failed to preserve this issue for review. Defendant's counsel failed to object to any of the allegedly improper questions. Since no objection was made, the alleged error, if any, was waived. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.) We note also that when it became apparent that the State would not present rebuttal evidence, defense counsel did not redirect the trial court's attention to the matter nor move for a mistrial thus waiving the issue. (See *People v. Collins* (1971), 132 Ill. App. 2d 553, 270 N.E.2d 226.) Furthermore, defendant failed to include this allegation of error in his written motion for a new trial. The failure of a defendant to raise an issue in his written motion for a new trial operates as a waiver, preventing the

issue from being argued as a ground for reversal upon review. *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.

In the instant case we find no basis for relaxing the general waiver rules. The evidence here was not closely balanced and defendant does not argue that he was not proven guilty beyond a reasonable doubt. We do not believe the errors complained of deprived defendant of his right to a fair trial.

Defendant next contends that the prosecutor's statement in closing argument that the State was not obligated to produce Smith and Taylor improperly placed a burden on him which the law does not require.

In closing argument the prosecutor stated:

> "And there were comments made about Adrienne Taylor and other witnesses that should have been called. Don't forget, ladies and gentlemen of the jury, he had known Archie Smith for seven years, I haven't. He knows Adrienne Taylor. I don't. Am I supposed to bring in his accomplices and put them on the witness stand to tell you what their conversations were?"

This argument was made in reply to earlier comments made by the defense counsel in his closing argument. Defense counsel had stated:

> "And you heard Mr. De John [the prosecutor] in his cross-examination mention things about him and Adrienne Taylor and Mr. Smith. You heard that about what supposedly was said and Mr. Collins says is not true. Did the State ever bring witnesses to rebut or impeach Joseph Collins? No, they did not."

■ The law is clear that defendant may not, after inviting reply in his closing argument, subsequently complain on appeal that he was prejudiced by the rebuttal which followed. (*People v. Burton* (1972), 6 Ill. App. 3d 879, 286 N.E.2d 792, *cert. denied* (1973), 411 U.S. 937, 36 L. Ed. 2d 399, 93 S. Ct. 1917.) Here, defense counsel made the first reference to the fact that Smith and Taylor had not been called to testify, thereby, by raising the inference that the State was keeping something from the jury. The prosecutor was then justified in attempting to dispel such an inference, and the defendant cannot be heard to complain. See *People v. Norfleet* (1973), 15 Ill. App. 3d 567, 304 N.E.2d 672.

Defendant next contends that he was denied a fair trial when members of the jury read newspaper accounts of co-defendant Archie Smith's trial and conviction. Prior to closing argument defendant moved for a mistrial on the grounds that two articles concerning Smith's trial and conviction had appeared that morning in two Chicago newspapers. An article in the Chicago Sun-Times related that the State argued that "Smith and Collins cased the theatre the day before the robbery," and that Smith's attorney argued that "Smith was coerced into going to the theater with Collins" and Taylor. An article in the Chicago Tribune stated that

Cathy Dempsey identified Collins and Smith as the men she saw running from the theater after the shooting. The Chicago Tribune article also stated that Hyle was shot after he "told holdup men he couldn't open it [the safe] without assistance."

Following defendant's motion for a mistrial, the trial court proceeded to individually examine the five members of the jury who had "read or discussed any newspaper accounts referring to or involving this case." Two jurors and one alternate juror had read one or both articles, one had read only a headline and a fifth had heard about the articles. Each juror stated that he would be able to fairly deliberate and decide the issues at trial without being influenced by factors not in evidence. Each juror also stated that he had not discussed the articles with any other member of the jury. Based upon his examination of the jurors, the trial court stated that he believed they "certainly will decide this case solely on the evidence." He specifically referred to the general demeanor of the jurors and the forcefulness of their answers.

■ The granting of a mistrial due to prejudicial publicity is a matter addressed to the sound discretion of the trial court. (*People v. Henderson* (1976), 39 Ill. App. 3d 502, 348 N.E.2d 854.) Our supreme court has, however, rejected the contention that every situation in which extraneous or unauthorized information reaches the jury results in prejudicial error. (*People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656.) To warrant a reversal, it must reasonably appear that at least some of the jurors have been so influenced or prejudiced that they cannot be fair and impartial. (*People v. Malmenato* (1958), 14 Ill. 2d 52, 150 N.E.2d 806, *cert. denied* (1958), 358 U.S. 899, 3 L. Ed. 2d 148, 79 S. Ct. 222.) The most controlling fact or circumstance to be considered by the trial court is the character and nature of the allegedly prejudicial article. *People v. Hryciuk* (1954), 5 Ill. 2d 176, 125 N.E.2d 61.

■ We do not believe that the trial court in the present case abused its discretion in denying defendant's motion for a mistrial. The trial court properly safeguarded defendant's right to a fair trial by thoroughly examining the jurors as to possible prejudice. Considering the nature of the allegedly prejudicial articles and the statements of the jurors to the trial court, we believe the trial court properly denied defendant's motion for a mistrial.

Defendant further contends that he was denied a fair trial where the jury was instructed on felony murder in the absence of any evidence indicating he was attempting to commit armed robbery. The trial court instructed the jury on murder as defined in section 9—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1973, ch. 38, par. 9—1(a)), which provides:

"A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than voluntary manslaughter."

Defendant concedes that there was ample evidence, if believed by the jury, to convict under sections 9—1(a)(1) or 9—1(a)(2), but argues that there was insufficient evidence to convict under section 9—1(a)(3). Since only a general verdict was rendered, he argues that it is impossible to determine on which charge the jury convicted him.

■■ The law is clear, however, that one proper count in an indictment will sustain an indictment where there is a general finding of guilt, and if any single count is sufficient, we need not determine on review whether the others are sufficient. (*People v. Skinner* (1947), 397 Ill. 273, 73 N.E.2d 427, *cert. denied* (1947), 331 U.S. 857, 91 L. Ed. 1864, 67 S. Ct. 1747.) A general finding of guilt is presumed to be based upon any good count in the indictment to which the proof is applicable. (*People v. Savage* (1955), 5 Ill. 2d 296, 125 N.E.2d 449.) Here, as the record indicates and defendant concedes, there is sufficient evidence to sustain a verdict of guilt and we need not consider whether the felony murder instruction was proper. See *People v. Randolph* (1954), 2 Ill. 2d 87, 116 N.E.2d 876.

■■ Defendant next contends that the trial court erred in allowing Dr. Shalgos, the State's expert witness, to testify concerning the cause of the head wound. Dr. Shalgos, who performed the autopsy on Hyle, testified that the "characteristics of the cut were such as to indicate that the individual was struck sharply with an object by someone standing on his left side and striking him from above sharply downward." The wound showed characteristics of gun-butt trauma. In his opinion the wound could not possibly have been caused by the gun recovered from Smith because the butt of that gun was too narrow and sharp. He believed the wound was, however, caused by the gun recovered from under the bushes where defendant spent the night or by one absolutely like it. Defendant argues that these opinions were based upon speculation rather than upon facts in evidence. We disagree. Dr. Shalgos obviously based his opinions upon his personal and detailed examination of the wound during the autopsy as well as upon his personal examination of the two guns in question. The facts upon which he based his opinions were in evidence. Accordingly, we find no merit in defendant's contention.

■■ Defendant finally contends that his sentence of 50 to 100 years for murder is excessive. The imposition of sentence, however, is a matter of judicial discretion and, absent an abuse of that discretion, the sentence of

the trial court will not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) In deciding whether the trial court has abused its discretion, we note that the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the object of restoring the offender to useful citizenship." (Ill. Const. 1970, art. 1, §11.) Defendant here was convicted of the brutal slaying of an apparently defenseless elderly man. The sentence imposed by the trial court is within the statutory requirements and we find no abuse of discretion.

Defendant's reliance upon *People v. Lott* (1978), 57 Ill. App. 3d 706, 373 N.E.2d 466, in support of his contention is misplaced. In *Lott*, defendant Cotton was convicted of two murders on an accountability theory, defendant Lott having actually committed the murders. Cotton received consecutive sentences of 100-150 years for each murder. On appeal, the sentences were changed from consecutive to concurrent. Significantly, the court did not actually reduce the sentences as contended by defendant here.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.