THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DOTHAN ROGERS, Defendant-Appellant.

Second District   No. 2—84—0494

Opinion filed August 12, 1985.

G. Joseph Weller and Robert Hirschhorn, both of State Appellate Defender's Office, of Elgin, for appellant.

Daniel Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Andrea Becker, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Dothan Rogers, was found guilty of attempted rape following a jury trial in the circuit court of Winnebago County. (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4 and 11—1(a).) He was sentenced to a six-year term of imprisonment. The defendant appeals.

On appeal, the defendant raises three issues. They are whether, (1) the State proved the defendant guilty of attempted rape beyond a reasonable doubt; (2) the court erred in barring the defendant's inquiry into the complainant's background regarding her attitude toward blacks; and (3) the defendant was denied a fair and impartial jury due to the jury's exposure to a newspaper article about the defendant during the course of the trial.

The defendant's pretrial motion to suppress identification evidence was denied following a hearing. The matter was set for a jury trial and on the date of trial, the defendant filed a motion *in limine* to prohibit the State from introducing any evidence of the defendant's prior convictions. The defendant had been convicted of kidnaping on January 16, 1980, and released from prison on October 6, 1983. The court denied the motion *in limine*.

The defendant made an oral motion *in limine* after the jury was selected and sworn. He asked that the State be prohibited from mentioning that the defendant was released from the penitentiary shortly before the defendant was arrested for the instant offense. The court granted the motion *in limine* "conditionally." The State would be allowed to bring out the information only if the defendant took the stand and the issue become relevant.

The 21-year-old complainant testified on direct examination that she was recently hired as a dancer at the Surf Lounge in Rockford. On October 6, 1983, she was at the lounge between 7 and 9 p.m. in order to meet the women with whom she would be working. The complainant was dressed in a swim suit (her job costume), underpants, panty hose, Levi jeans, a sweat shirt, and shoes with two-inch heels when she left the lounge at about 9 p.m. to walk home.

The complainant was on her way to her apartment at 215 Seventh Street when she passed the defendant. She then heard him walking behind her. The complainant walked through a parking lot and the defendant went around another building. As the complainant crossed First Street, the defendant was walking behind her again.

The complainant was ascending the back stairway to her apartment when the defendant called to her for help. He was standing on the ground and the complainant was halfway up the first flight of stairs. She could not understand him because she said he was speak-

ing in "somewhat of a foreign language." The complainant walked back downstairs to assist him. The defendant was apparently lost. He had a bus schedule with a map on the back of it. He asked the complainant to walk across the street with him to another parking lot but she refused. She said she would go upstairs and get her friend to go with her. The complainant shared the apartment with Barbara and Preston Dammann and their child.

The complainant started up the stairs again. The defendant hit her in the back of the neck causing her to fall face down on the stairs. As a result, the complainant suffered a nosebleed. The complainant screamed, but the defendant stuck a sharp object in her neck and told her it was a knife. However, she never saw the object. The defendant pushed her around and said he would kill her. The complainant did not attempt to run away because she was afraid he would catch her and kill her.

They stood by the wall for awhile. The defendant said that they had to wait for some friends who were coming to pick him up and the friends were going to take the complainant somewhere. He also said that "his country and our country were at war, that they had sent him to come get me for some unknown reason." The defendant then forced the complainant to go under a stairway where he kept her for approximately three hours.

While in this location, the defendant demanded oral sex. The complainant told him he was "nuts," at which point he pushed her against the wall. The defendant told her to cooperate or he would kill her. He continued to "make demands," but the complainant refused.

The defendant became angrier as the complainant refused his demands. He struck her a couple of times on the left side of her face and choked her. She said her jaw was swollen the next day and her nose was scratched as a result.

The complainant told the defendant that she was pregnant in an attempt to make him stop. It failed. She actually became sick to her stomach and was not feigning to be ill. Earlier, she pretended to be unconscious when the defendant knocked her down on the stairs, but that did not succeed.

The defendant wanted to have intercourse with the complainant. He insisted she remove her jeans. When she refused, he pulled down her pants. He also removed her swim suit, panty hose and underpants, although her sweat shirt was not removed. The defendant pushed the complainant's legs apart. He also fondled her by touching her genitals with his fingers.

Two white males were walking down the alley. The complainant

fled from the defendant toward the men. There was a gate separating her from them. She ran through the gate, although she could not remember who opened it. The complainant yelled at the men to help her. She then ran to the front door of the building and upstairs to her apartment. The complainant saw Preston and Barbara Dammann when she entered and told Barbara that "some black s.o.b. tried to rape me down out back."

Later, the complainant was escorted by the police out the back door of the apartment into a squad car. She was told that someone was apprehended and that she was to look at the man to see if she could identify him as her assailant. As the complainant went by the defendant, she identified him as the man.

On cross-examination, the complainant was asked about her background regarding where and with whom she lived prior to living at 215 Seventh Street. She answered that she lived in Rockton with her parents about 1½ to 2 months before living with the Dammanns. When defense counsel asked her about her brothers and sisters, the State's objection to the question was sustained. The defense counsel then asked to be heard outside the presence of the jury.

After the jury was removed, the defense counsel explained to the court the need to inquire into the complainant's attitude toward blacks and her prior exposure to them. Counsel's theory was that the complainant was concerned about her reputation when she realized she would be seen by two white men while she was in a compromising situation with a black man. She then screamed rape in order to protect her reputation. While the court conceded the viability of the theory, it sustained the State's objection on relevancy grounds. It indicated that the line of questioning was not relevant at that time.

When cross-examination continued, the complainant said she had removed her shoes after the defendant knocked her down on the stairs and before they moved under the stairway. She also described how the defendant undressed her. The complainant said he held her with one hand while he opened the belt, button and zipper on her jeans and then pulled the jeans down her legs. She pulled her legs out of the pants. The complainant pulled her arms inside her sweat shirt and removed the shoulder straps of her swim suit. The defendant pulled off the swim suit, panty hose and underpants. The complainant did not at any time remove her sweat shirt, nor did the defendant remove it. The defendant did not open his pants and the complainant never saw his penis.

The complainant further testified on cross-examination that when she heard the two men in the alley, she ran to the gate and opened it.

She screamed when she ran from the defendant and only stayed by the two men for a few seconds. The defendant came to the gate but she ran away. The complainant said she did not show the police her nosebleed, bruised cheek or scratched nose. No photos of her were taken at the police department, and she did not seek medical treatment.

Todd Gorzynski was one of the two men who came down the alley the night of the incident. He testified that Jeffrey Bolton and he were visiting a friend at a third-floor apartment at Seventh and Second Avenues, arriving at about 8:30 p.m. on October 6, 1983. They left the apartment by way of the back stairs at about 1 a.m.

When Gorzynski and Bolton reached an alley, they began walking north toward a closed gate. The lighting in the area was dim. Many apartments faced the alley. Bolton opened the gate and Gorzynski saw the defendant and the complainant under the stairway. The complainant screamed that she needed help and that someone was going to kill her. She ran by Gorzynski and Bolton and then stopped for about a minute. The complainant was hysterical and wearing only a shirt.

Bolton had let the gate shut but the defendant opened it again. The defendant told Gorzynski and Bolton that the complainant was his girlfriend and that she did things like this all the time. Then the complainant ran in one direction and the defendant ran in the opposite direction. He "bobbed around the corner, bobbed back," asked Gorzynski and Bolton if they saw her, and then ran in the other direction (north).

Gorzynski could not see any marks or blood on the complainant's face. He could not tell if the defendant's pants were undone or if the defendant's penis was exposed. Gorzynski did not see any weapons.

After the defendant ran north, Gorzynski and Bolton continued on into the parking lot. People came out onto the second-floor porch, and Preston Dammann came downstairs. Bolton and Preston chased the defendant, and Gorzynski flagged down an accident investigation van.

Jeffrey Bolton testified substantially the same as Gorzynski. When he opened the gate, he saw the defendant step back and the complainant ran toward Gorzynski and Bolton. She went slightly past them before she stopped for a few seconds. Her face was shiny, her make-up running, and she was crying and hysterical. The defendant said to the complainant, "Don't come on, [complainant]. Don't do that to me again tonight." Then the defendant spoke to Bolton and Gorzynski and said he and the complainant lived upstairs. Bolton did not notice any injuries to the complainant.

The complainant ran and the defendant went in the other direc-

tion. Bolton and Preston were pursuing the defendant, who was walking, when a police car stopped the defendant. Bolton told the officer that the defendant just raped a girl. While walking behind the defendant, Bolton accused him of rape but the defendant said nothing.

The Dammanns were called to testify by the State. Preston Dammann said that he was asleep with his wife, Barbara, in the apartment they shared with the complainant when the complainant came home and woke them. She was hysterical and crying, her left cheek was swollen, and she was dressed only in a sweater. After a brief conversation between the complainant and Barbara, Preston went down the back stairs and met Bolton and Gorzynski. They gave chase, and Bolton identified the defendant as the man for whom they were looking. They caught up to the defendant, who had been walking, when the policeman stopped him. Preston told Officer Bruce Olson that the defendant had tried to rape the complainant and the defendant said nothing.

On cross-examination, Preston said he accused the defendant of rape when pursuing him, and the defendant denied it several times. Preston did not hear any screaming while in his apartment before the complainant came in. Preston said the complainant's injury was readily apparent the next day. It was on the left side of her face, a 2- to 3-inch inflamed red bruised discoloration.

Barbara Dammann testified substantially as had Preston. She noticed the complainant's left cheek was "puffed out" when the complainant woke her. The next day she noticed a scratch on the right side of the complainant's nose and the complainant's cheek was bruised. Barbara saw the complainant had a bloody nose when she was taken to the squad car. Barbara called the police.

Rockford Police Officer Bruce Olson was on patrol at about 1 a.m. on October 7, 1983, when he heard a broadcast describing a black male wanted by the police. He testified that he proceeded down State Street where he saw a black male, the defendant, walking, followed by three white males who were gesturing toward the defendant. The defendant matched the description, and Olson stopped him. When Olson exited the car, at least two of the white males stated he had just raped a white woman. The defendant did not respond to the accusation.

Then Olson contacted Officer Ben Clay by radio to inform him of the defendant's detention. Clay inquired whether the defendant was wearing a gold chain or black, pointy-toed shoes. Olson confirmed that he was. The defendant was then transported to the police station.

Olson tagged certain evidence recovered from the defendant,

which included a bus depot locker key, bus schedule, ball point pen, small address or phone book, and clothing. No weapon was found on the defendant's person. The officer also recovered the complainant's clothing, purse, and shoes from under the stairway when he returned to the scene of the incident later that night.

Olson returned the complainant's purse to her at the police station. He did not see any bruise to her cheek, scratch on her nose, or a bloody nose. As far as he knew, no photos were taken of the complainant.

Officer Richard Beishir, commander of the identification section of the police department, testified that a mistake was made in not having photographs taken of the complainant after the incident. He stated it was written policy to have such photographs taken, regardless of whether there were any marks on the victim.

Officer Jim Vandiver, also testifying for the State, said that the defendant had a chain around his neck when he was arrested. At the station, the defendant asked to use the restroom. While in the restroom, the defendant flushed the toilet five or six times. Vandiver later searched for the gold chain and found it in the toilet bowl.

After the State rested, the defense called Officer Ben Clay to testify. He interviewed the complainant for over an hour and a half on the night of the incident and saw no injuries, blood or swelling to her face.

The defendant testified on his own behalf that he met the complainant on October 6, 1983, as they were both walking on East State Street. After a brief conversation, they walked to the back area of the complainant's apartment. they continued to talk and then smoke some marijuana. After about 45 minutes, they began kissing. The two moved under the stairway, where the defendant fondled the complainant. The complainant started taking off her clothing.

While they were under the stairs, an old man walked by with a dog. The complainant told the defendant to keep quiet. When the man left, they continued with their activity. Later, they heard some people talking and then the gate in the alley opened. One of the men at the gate looked through the opening, and the defendant stepped back to see what they were doing. At that point the complainant started toward the men at the gate, screaming that the defendant had tried to rape her.

The defendant walked to the gate and spoke to the complainant, who was standing about eight feet away from him. He said, "I ain't raped you or done nothing." The defendant called her by her surname and said, "Come here; where are you going?" She would not come

back, so the defendant went back to the stairwell, picked up the complainant's clothes, and again went to the gate. The defendant told her to get her clothes, but the complainant kept hollering that the defendant raped her. The defendant turned around, threw the clothing back under the stairs, and walked away.

The defendant also spoke to the two men standing by the gate. One of the men had a beer in his hand and said, "We ain't got nothing to do with this." The defendant denied telling the men that the complainant and he lived upstairs or that she was his girl friend.

After the defendant left, he heard three men following him. They yelled at him, "Nigger, you raped a white girl. We are going to get you, kill you." The defendant denied the accusations. Subsequently, he was stopped by a police officer. The defendant was placed in a one-man show-up for identification and then taken to the police station. He acknowledged trying to get rid of the gold chain out of fear of the rape charge.

The defendant denied knocking down the complainant. He said he did not strike or choke her, nor did he use any sharp objects against her. The defendant claimed he never threatened to kill the complainant. His pants were not unzipped during their activities together.

On cross-examination, the defendant stated that he came from the west side of town to put money in a bus depot locker on the night he met the complainant. He admitted fondling her breasts and genital area. Although the defendant was interested in having intercourse with the complainant, she refused. The defendant did not go beyond fondling her; he did not remove his penis from his pants. He said he did not force the complainant's legs apart.

During the State's rebuttal, the parties stipulated that on January 16, 1980, the defendant was convicted of the offense of kidnaping.

At the close of all the evidence and arguments, the jury returned a verdict of guilty against the defendant.

On December 20, 1983, the trial judge informed both attorneys he had been contacted by a juror who told him that another juror had read a newspaper article about the case and spoken to other jurors about it during jury deliberations. The article, which appeared in the Rockford Register Star on December 15, 1983, stated that the defendant was being tried for the attempted rape of a Rockford woman. However, it further stated that the defendant was arrested in 1979 on charges of kidnaping and rape in separate incidences. He was convicted of kidnaping and sentenced to prison in 1980. The article also provided that the defendant was released from prison the day before the alleged attack herein.

Defense counsel filed a motion for a new trial. The motion alleged juror misconduct and requested a hearing on the matter. The court only allowed the motion as far as permitting *voir dire* of the jurors at that point.

During *voir dire*, Melvin Hancock admitted that he read the article and spoke to other jurors about it. When asked why he disobeyed the court's admonition about reading the article, Hancock said, "I guess I was just curious, sir." He denied giving any consideration to the factors mentioned in the article in reaching a verdict. Hancock claimed he told the other jurors that the article did not reveal anything they had not already heard in the courtroom regarding the kidnaping. He said he discussed nothing else.

Five other jurors remembered juror Hancock talking about the article. Juror Robert Bailey stated juror Hancock informed the jurors that the defendant just got off the bus from prison, but juror Bailey could not recall if juror Hancock mentioned the prior rape charge. Bailey said Hancock brought up the article twice. Juror William Anderson said Hancock mentioned the article, but Anderson could not remember what Hancock said about it. Juror Donald Erickson also heard Hancock but could not recall whether Hancock revealed the article's contents. Juror Suzanne Schafman heard of the article from juror Hancock. She claimed Hancock said the article provided nothing the jury had not heard. However, juror Schafman read the article after a verdict was reached and was "shocked." She said her verdict might possibly have been affected if she knew the defendant had been charged with rape and he had been released from prison the day before the instant offense. Juror M. E. Kegel heard the article mentioned by another juror but could not remember by whom. She did not hear any other specifics regarding the article. All the jurors denied the article had any effect on their verdict.

The trial judge denied the motion for a new trial, as well as a supplement to motion for new trial. The defendant was subsequently sentenced to a six-year term of imprisonment.

■■ In his first issue presented on appeal, the defendant claims the State failed to prove him guilty of attempted rape beyond a reasonable doubt. He argues that the complainant's testimony was not clear and convincing nor corroborated by other facts or evidence as required to sustain the conviction. (*People v. Anderson* (1974), 20 Ill. App. 3d 840.) The defendant points to various factors in the complainant's testimony to support his contention that the intent to commit rape was not proved as well as the consensual nature of the incident.

The crime of attempt, as defined by the Criminal Code of 1961,

requires that a person, with intent to commit a specific offense, does any act which constitutes a substantial step toward the commission of the offense. (Ill. Rev. Stat. 1983, ch. 38, par. 8—4(a).) The specific offense for which the defendant was convicted of attempting, rape, is committed by only one type of activity, sexual intercourse. (*People v. Shelby* (1984), 123 Ill. App. 3d 153.) To commit attempted rape then, the male must intend to accomplish intercourse by force and against the female's will and must take a substantial step toward accomplishing his purpose. (*People v. Hanley* (1977), 50 Ill. App. 3d 651, 659.) However, such an intention may be inferred from such factors as the conduct of the accused, the character of the assault, the nature of the acts done, and the time and place of the occurrence. 50 Ill. App. 3d 651, 659.

The defendant initially notes the length of time involved in the offense herein. The complainant testified that she was with the defendant for almost four hours, the last half hour of which she was naked except for a sweat shirt. Despite the length of time, the act of rape was not completed. The defendant claims that the intent to commit rape cannot be inferred without taxing credulity when he did not accomplish his intent although there was an extended opportunity to do so.

The defendant states he did not remove any of his clothing or expose his penis during the incident. Relying upon *People v. Pitts* (1980), 89 Ill. App. 3d 145, the defendant concedes his conduct might give rise to an inference of intent to obtain sexual gratification by means other than intercourse. In *Pitts*, the defendant did not disrobe or expose himself and the victim remained fully clothed. The victim laid face down on the floor while the defendant laid on top of her. He moved his body up and down until he experienced orgasm and then fled. The appellate court reversed the conviction for attempted rape finding a lack of the specific intent to commit rape.

Although the instant complainant described the manner in which she was forced to disrobe, the defendant claims that her version supports his argument that the activity was consensual as well as the lack of intent to commit rape. He contends the complainant would not have been allowed to keep her sweat shirt on if he was a "sex-starved maniac."

The defendant further contends that the complainant's failure to call for help undermines her testimony. Although she said she screamed when the defendant first struck her and when she fled, she did not scream any other time despite the surrounding residential area. See *People v. Rosario* (1982), 110 Ill. App. 3d 1020.

Since the complainant's testimony was not clear and convincing, it needed corroboration which was lacking, according to the defendant. He points to the complainant's testimony wherein she stated that her nose was bloodied and her cheek was swollen, but individuals who saw her that night did not see the injuries. She also said the defendant threatened her with a sharp object. When he was apprehended, the defendant only had a key and a pen.

As previously stated, the intent to commit rape may be inferred from the surrounding circumstances. (*People v. Almond* (1975), 31 Ill. App. 3d 374.) In the case at bar, the defendant attacked the complainant at night in an alley behind an apartment building. He struck her, knocking her down on the stairs, and threatened her with a sharp object pressed against her. The defendant hit her a few more times, choked her, and threatened to kill her. He forced her under the stairway where he made her disrobe. The defendant fondled her genitals, demanded intercourse, and pushed the complainant's legs apart. He was interrupted when two men entered the alley and the complainant ran from the defendant to the men. See *People v. Kleba* (1982), 110 Ill. App. 3d 345, wherein similar actions by the defendant were held to be in furtherance of the substantive crime of rape and constituted a substantial step toward the commission of the offense from which the specific intent needed to convict for attempted rape could be inferred.

■ The defendant relies upon the fact that he did not remove any of his clothing or expose his penis to support his claim that intent to commit rape was not proved. Specific intent to rape may be inferred although the defendant did not remove his clothing or even the clothing of his victim. (*People v. Shelby* (1984), 123 Ill. App. 3d 153; *People v. Oetgen* (1978), 62 Ill. App. 3d 29.) Neither defendant in *Shelby* nor *Oetgen* exposed themselves, and yet their convictions for attempted rape were affirmed. The attempted rape conviction was affirmed in *People v. Bonner* (1967), 37 Ill. 2d 553, although the defendant did not expose his genitals.

■ The defendant's reliance upon *People v. Pitts* (1980), 89 Ill. App. 3d 145, is misplaced because the factual situation in *Pitts* is distinguishable. The reviewing court in *Pitts* found the circumstances did not establish an intent to commit the specific offense of rape since the defendant made no overt move toward the victim's genitals. He made no reference to intercourse and obtained sexual satisfaction without intercourse and while both remained clothed. The situation herein is clearly different. The defendant forced the complainant to remove most of her clothing, including her underpants. He expressed a demand for intercourse, pulled the complainant's legs apart, and fondled

her genitals. Even on cross-examination, the defendant said he was interested in sexual intercourse. The defendant was prevented from physically manifesting his intent to rape by the interruption of Gorzynski and Bolton.

The complainant was forced to remove all of her clothing except her sweat shirt. This fact does not show the defendant's lack of intent to commit rape. In *People v. Porter* (1973), 13 Ill. App. 3d 893, the defendant forcibly removed the victim's pants while he held her and then raped her. His conviction for rape was affirmed. The victim in *People v. Kleba* (1982), 110 Ill. App. 3d 345, was forced by the defendant to pull down her pants and underwear and bend over while he fondled her genitals. The defendant's conviction for attempted rape was affirmed. In *People v. Testa* (1983), 114 Ill. App. 3d 695, only the victim's pants were removed but the defendant's conviction for attempted rape was affirmed.

■ Nor is the defendant's attempt to use the manner in which the complainant was forced to undress supportive of his argument that the incident was consensual. The complainant's removal of some of her clothing is an isolated fact which does not show consent. (*People v. Jones* (1976), 40 Ill. App. 3d 850.) The defendant had struck the complainant a few times, choked her, and threatened to kill her more than once. The complainant refused his demands and attempted to dissuade him by claiming pregnancy, becoming ill, and feigning unconsciousness. Her subsequent removal of most of her clothing did not constitute consent in view of the defendant's prior show of force. *People v. Witte* (1983), 115 Ill. App. 3d 20.

■ The complainant's testimony was clear and convincing despite her failure to continue to cry out during her ordeal. Such failure did not indicate her consent. The complainant screamed when the defendant initially attacked her, but no one came to her assistance. (*People v. Jones* (1976), 40 Ill. App. 3d 850.) In light of the defendant's threats to kill her and the prior use of force against her, further resistance by the complainant was unnecessary. (*People v. Daniels* (1984), 129 Ill. App. 3d 894.) When Gorzynski and Bolton opened the gate to the alley, the complainant screamed and ran toward the two men. She escaped at the first opportunity. (*People v. Witte* (1983), 115 Ill. App. 3d 20.) These facts distinguish it from *People v. Rosario* (1982), 110 Ill. App. 3d 1020, relied upon by the defendant. In *Rosario*, the victim was left alone in the car in an area where other people were visible to her and yet she failed to summon help.

■ The fact that the incident took place over almost a four-hour period of time does not show the defendant's lack of intent to commit

rape. The evidence indicated that the complainant resisted the defendant's demands and that his activities progressed toward completion of the rape. If the defendant had accomplished his specific intent, as he appears to argue was necessary, he would have been tried for rape. The acts of the defendant were clearly in furtherance of the substantive crime of rape and constituted a substantial step toward the commission of the offense from which the trier of fact could infer the specific intent needed to convict the defendant of attempted rape. *People v. Almond* (1975), 31 Ill. App. 3d 374, 378.

In a sexual assault case the findings of the trier of fact will not be overturned unless they are contrary to the weight of the evidence. (*People v. Almond* (1975), 31 Ill. App. 3d 374.) The complainant's testimony was clear and convincing. Although corroboration is needed when such testimony is not clear and convincing, there was corroboration of the complainant's testimony. The Dammanns observed the complainant's injuries. The fact that only a pen and key were found on the defendant when he was apprehended may not corroborate the complainant's testimony that he held a sharp object against her, but it is insufficient evidence to rebut her other testimony. The complainant said she never actually saw a weapon. The defendant was proved guilty of attempted rape beyond a reasonable doubt.

■ Next, the defendant contends the court erred in barring the defendant's inquiry during cross-examination of the complainant into the complainant's background regarding her attitude toward blacks. The defendant's theory of defense was that the complainant voluntarily accompanied him and consented to their sexual liaison. However, she changed her mind when she, a white women, realized she would be seen in a compromising situation with a black man by two white men, Gorzynski and Bolton. To prevent damage to her reputation, the complainant screamed "rape." In order to lay the evidentiary basis for this theory, the defendant sought to question the complainant about her background. He claims the court's ruling which sustained the State's objection to one of the questions deprived him of key evidence and robbed his defense of its persuasive power. The defendant claims that the court's relevancy ruling was erroneous.

The State responds by initially claiming the defendant has waived any error in this regard because the defense counsel abandoned the line of questioning. It also argues that the court properly sustained the objection on relevancy grounds. Even if the court did restrict cross-examination, the State contends the testimony regarding the complainant's attitude toward blacks was an immaterial matter. If there was error in excluding the testimony, it was harmless.

On cross-examination, the following exchange occurred between the defense counsel and the complainant:

"Q. Where was home?

A. In Rockton.

Q. In Rockton?

A. Uh - huh. (Affirmative response.)

Q. Who did you live there with?

A. My parents.

Q. Any brothers or sisters?

A. No."

The State objected, the court sustained the objection, and the defense attorney asked to be heard outside the presence of the jury.

Outside the jury's presence, the defense counsel explained his theory. The trial court agreed that such a defense was proper, but ruled that the question objected to was not relevant at that point. The court stated, "I can understand the thrust of your argument, what you wish to go into, but the question was posed does she have any brothers and sisters; objection sustained." In determining this question was not relevant, the court stated:

"Unless her brothers and sisters were with her, something of this nature, one of them is a half-brother, these people are around, testified for the prosecution. It is not relevant; objection sustained."

The defense counsel requested further clarification as to whether this line of questioning would ever be proper. The court responded by reiterating that the question was "not proper at this time." The court asked the defense attorney if he wished to take a short recess before proceeding, and he did. When the trial resumed, the defense attorney completely refrained from this entire line of questioning.

The defendant claims that the credibility of the complainant and the defendant were central to the case. It was necessary to show the complainant's interest in her reputation in order for him to establish his theory of defense that the complainant first consented to the liaison and then changed her mind. While the defendant contends the court restricted this cross-examination of the complainant in this regard, the record does not support his argument.

The scope of cross-examination of a witness rests largely within the sound discretion of the trial court, and its ruling will not be disturbed on review unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Lenard* (1979), 79 Ill. App. 3d 1046, 1050.) The witness may be impeached on cross-examination by showing interest, bias, or motive which might in-

fluence the witness' testimony. (*People v. Nowak* (1979), 76 Ill. App. 3d 472, 477.) However, evidence of bias, motive, or interest must not be remote or uncertain because it must potentially give rise to the inference that the witness has something to gain or lose by his testimony. (*People v. Foley* (1982), 109 Ill. App. 3d 1010, 1015.) Even if there is an error in restricting the scope of cross-examination, it will rise to the level of reversible error only if the defendant manifestly suffered prejudice as a result. (*People v. Crosser* (1983), 117 Ill. App. 3d 24, 30.) The error is harmless unless a reasonable doubt exists that the restriction could have contributed to the defendant's conviction. *People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 696.

■ The trial court has a wide scope for decision when it comes to issues of relevancy and materiality and may reject evidence which it determines to be of little probative value because of the evidence's remoteness, uncertainty or conjecture. (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 537.) Relevant evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. (*People v. Monroe* (1977), 66 Ill. 2d 317, 322.) This court will not disturb the trial court's ruling where the record indicates a sufficient basis for the decision and there is no abuse of discretion. *People v. Gardner* (1977), 47 Ill. App. 3d 529, 537.

■ ■ In the case at bar the attempted rape of the complainant occurred in Rockford. The complainant was from Rockton. She was 21 years old. The complainant lived with the Dammanns in Rockford. The complainant did not know Gorzynski or Bolton. There was no indication in the record that Gorzynski, Bolton or even the Dammanns knew the complainant's family. No brothers or sisters were in the area at the time of the incident. There is no indication in the record that her family was involved in the trial. The defendant's question of the complainant regarding her brothers and sisters was not relevant. Testimony concerning the complainant's bias, motive, or interest in this regard would have been speculative. Evidence of the defendant's theory of the complainant's bias, motive, or interest was remote and uncertain. The cases cited by the defendant in support of his argument, *People v. Coles* (1979), 74 Ill. 2d 393, and *People v. Lenard* (1979), 79 Ill. App. 3d 1046, involved a witness with bias, motive, or interest directly involving the defendant. It was not an abuse of discretion to sustain the State's objection on the basis of relevancy.

■ The trial court did not restrict cross-examination of the complainant. In fact, the court thought the defense was "sophisticated." It found the question irrelevant at that time but did not prevent the

defendant from developing his theory at a later point. The court even permitted the defendant a recess before continuing cross-examination of the complainant. It was the defense attorney who abandoned the line of questioning and made no further attempt to pursue a theory of bias, interest, or improper motivation on the part of the complainant. (*People v. Mytnik* (1978), 66 Ill. App. 3d 624; accord, *People v. Hardy* (1979), 70 Ill. App. 3d 351.) The defendant cannot now claim that the court restricted his cross-examination of the complainant.

■■ Lastly, the defendant claims he was denied a fair and impartial jury due to the jury's exposure to a newspaper article about the defendant during the course of the trial. Due to the contents of the article, at least one of the jurors knew of the defendant's prior arrest for rape and that juror and another knew the defendant was released from prison the day before the instant incident. The latter fact was described as "unduly prejudicial" by the trial court when it conditionally granted the defendant's oral motion *in limine* to preclude the State from introducing that fact during trial. The defendant claims the juror who read the article tainted the jury further by mentioning it to five other jurors and by his participation in deliberations. Because of the exposure to the article, the defendant argues that the jury was prejudiced against him despite the jurors' claim on *voir dire* that their verdict was not affected. He requests a reversal of his conviction and a new trial.

The State submits that the trial court properly safeguarded the defendant's right to a fair trial by thoroughly examining the jurors regarding possible prejudice. It argues the nature of the article does not compare to the article in *People v. Hryciuk* (1954), 5 Ill. 2d 176, relied upon by the defendant. The State claims the trial court did not abuse its discretion in denying the defendant's motion for a new trial.

A fair trial requires the participation of impartial jurors. (*People v. Jones* (1985), 105 Ill. 2d 342.) If it is alleged that the jury has been improperly influenced by allegedly prejudicial material like a newspaper article, the trial court must determine whether such material prejudiced the defendant. (*People v. Trejo* (1976), 40 Ill. App. 3d 503.) The determination rests within the sound discretion of the trial court. (*People v. Malmenato* (1958), 14 Ill. 2d 52.) Its determination will not be set aside absent an abuse of that discretion. *People v. Hryciuk* (1954), 5 Ill. 2d 176.

■ To warrant a reversal on this issue, it must reasonably appear that the jurors, or at least some of them, have been influenced or prejudiced so that they can no longer be fair and impartial. (*People v. Malmenato* (1958), 14 Ill. 2d 52, 65.) A juror's statement upon interro-

gation that he has not been influenced should not be considered conclusive, for jurors themselves are incapable of knowing the effect which prejudicial matters may have upon their unconscious minds. (*People v. Hryciuk* (1954), 5 Ill. 2d 176.) The determination of prejudice then rests not only upon what the jury says, but also upon the nature of the material and all the facts and circumstances in the record. (*People v. Lampson* (1972), 6 Ill. App. 3d 1099.) However, not every situation in which extraneous or unauthorized information reaches the jury results in prejudicial error. *People v. Collins* (1979), 71 Ill. App. 3d 815.

■■ In the case at bar, one juror, Melvin Hancock, read a newspaper article concerning the defendant during jury deliberations in defiance of the trial court's admonitions to refrain from such activity. He then apparently mentioned the article to five other jurors. Four of them either could not recall the specifics of Hancock's discussion or stated he said the article provided no other information that the jury had not already heard. However, one other juror, Robert Bailey, did remember Hancock saying the defendant was just released from prison before the incident. Bailey's statement contradicted Hancock's claim that he only told the other jurors the article said nothing new.

The alleged error regarding jury impartiality did not come to the court's attention until after the verdict was rendered. Although the trial court thoroughly examined the jurors as to possible prejudice in an attempt to safeguard the defendant's right to a fair trial (*People v. Collins* (1979), 71 Ill. App. 3d 815), the defendant claims its determination was an abuse of discretion. Each exposed juror indicated his verdict was not affected, however, other factors must be considered.

Due consideration must be given to the nature and character of the statements in the article. (*People v. Malmenato* (1958), 14 Ill. 2d 52.) The supreme court has stated that the most controlling fact or circumstance to create an inference of prejudice is the character and nature of the statements. (*People v. Hryciuk* (1954), 5 Ill. 2d 176; *People v. Collins* (1979), 71 Ill. App. 3d 815.) The source of the information in the article has also been noted by the court. *People v. Malmenato* (1958), 14 Ill. 2d 52; *People v. Jones* (1978), 65 Ill. App. 3d 435.

The newspaper article in issue herein was not of the inflammatory nature found in *People v. Hryciuk* (1954), 5 Ill. 2d 176. (*People v. Lampson* (1972), 6 Ill. App. 3d 1099; *People v. Robertson* (1966), 74 Ill. App. 2d 360.) The article was factual in nature and used the words "alleged attack" in reference to the matter in issue. (*People v. Pisarski* (1972), 6 Ill. App. 3d 235.) However, it contains certain information which was prejudicial to the defendant.

The article stated the defendant was arrested on the charge of

rape in 1980. No further information on the disposition of the charge was provided. Evidence of a prior arrest is not relevant to any matter in issue and should not have been made available to the jury. (*People v. Warmack* (1980), 83 Ill. 2d 112, 128.) While the error in revealing a prior arrest is obvious, a consideration of the totality of the evidence presented during trial can make the error harmless. *People v. Warmack* (1980), 83 Ill. 2d 112.

The fact that the instant defendant raised consent as a defense made his credibility crucial in that regard. (*People v. Schuning* (1985), 106 Ill. 2d 41.) The revelation that he was once arrested on an unrelated charge of rape, the offense he was being tried for herein, could have influenced the jurors' verdict against the defendant. (*Cf. People v. Jones* (1978), 65 Ill. App. 3d 435, wherein the jury's knowledge of prejudicial information regarding the defendant's other offenses did not warrant a new trial.) However, the evidence supported the jury's verdict beyond a reasonable doubt, as discussed in the first issue. Although the complainant's credibility was largely in issue, her testimony was clear and convincing and corroborated. In view of the substantial competent evidence of guilt, the error (alone) was harmless.

Information in the article did not stop with the defendant's prior arrest. The article also stated that the defendant was released from prison the day before the incident. This fact was specifically excluded by the trial court when it ruled on the defendant's motion *in limine*. While the trial court did grant the motion "conditionally," the circumstances which would have given rise to the introduction of this evidence did not occur. The court labeled the evidence as "unduly prejudicial." *Cf. People v. Keegan* (1971), 52 Ill. 2d 147, wherein a newspaper article stated that slides of nude children were seized from the defendant's apartment and such evidence had been suppressed by the trial court prior to trial.

The State relies upon *People v. Jones* (1978), 65 Ill. App. 3d 435, in support of the argument that reversible error did not occur. On the second day of the defendant's trial on the charges of rape, burglary, and robbery in *Jones*, a newspaper article stated that the defendant had been sentenced for the rape of one woman, was presently on trial for the rape and robbery of another, and had pending charges against him for the attempted rape of another. Only one of the jurors actually read the article, another saw the headline and first paragraph, one saw only the headline, and one saw the name "Jones" and read no further. The defendant's motion for a mistrial was denied.

On appeal, the court compared the *Jones* case to *People v. Keegan* (1971), 52 Ill. 2d 147, and *People v. Malmenato* (1958), 14 Ill. 2d 52.

Since the article concerned only other offenses rather than including a reference to evidence suppressed in the case, the *Jones* court found the case more like *Malmenato*. It also noted the uncontradicted evidence that the defendant admitted the offense and that none of the information in the article was purported to have been given by the prosecutor. The court affirmed the trial court's denial of the motion for a mistrial.

In the case at bar a juror not only knew of the defendant's prior arrest, but also had information which was specifically excluded by the trial court because of its prejudicial nature. The juror exacerbated the situation by informing another juror of the latter fact. This case more strongly resembles *People v. Keegan* (1971), 52 Ill. 2d 147, in this regard. Also, the instant defendant denied he committed any acts against the complainant's will. He contradicted her version of the events. However, the source of the information in the article was not ascribed to the prosecutor. The information regarding the defendant's recent release from prison should not reach the jury through the back door and affect its verdict when the front door was closed to it. *People v. Lampson* (1972), 6 Ill. App. 3d 1099.

The State attempts to minimize the effect of the information upon the jury. It claims the jury would naturally have inferred the defendant was recently released from prison from the fact that the defendant was convicted and sentenced for kidnaping in January 1980. However, such an inference is speculative, since it is unlikely that a jury would be so knowledgeable regarding sentencing to know when the defendant was released. Besides, the fact that the defendant was released only the day before the incident was prejudicial.

Another consideration is the fact that none of the jurors informed the court of Hancock's action until after the verdict was rendered. This may be indicative of a lack of appreciation for their responsibility as jurors. *People v. Jones* (1985), 105 Ill. 2d 342.

Considering these facts and circumstances, the defendant did not have a fair and impartial jury. The article revealed a prior arrest for rape and information specifically excluded from the trial by the court. It was not a harmless error despite the evidence against the defendant. See *People v. Jones* (1985), 105 Ill. 2d 342.

The judgment of the circuit court of Winnebago County is reversed and remanded for a new trial.

Reversed and remanded.

SCHNAKE and STROUSE, JJ., concur.